688 A.2d 1114

LAWRENCE BROMFELD AND CAROLE ANN BROMFELD, PLAIN-
TIFFS–RESPONDENTS, v. THE HARLEYSVILLE INSURANCE
COMPANIES AND HURON INSURANCE COMPANY, DEFEN-
DANTS–APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued January 7, 1997—Decided February 27, 1997.

Before Judges DREIER, NEWMAN and VILLANUEVA.

*Michael J. Mernin* argued the cause for appellants (*Gennet, Kallmann, Antin & Robinson,* attorneys; *Mr. Mernin,* of counsel and on the brief).

*Allan Maitlin* argued the cause for respondents (*Sachs, Maitlin, Fleming, Greene & Wilson,* attorneys; *Mr. Maitlin,* of counsel and on the brief).

The opinion of the court was delivered by

VILLANUEVA, J.A.D. (retired and temporarily assigned on recall).

Defendants, Huron Insurance Company (Huron) and The Harleysville Insurance Companies (Harleysville), appeal from a summary judgment entered against them in the amount of $107,151.92 plus interest for damages caused by the collapse of a basement wall in plaintiffs' house. Huron[1] had issued a homeowner's insurance policy ("Policy") which plaintiffs claim covered the loss or they reasonably expected covered the loss.

Plaintiffs, Lawrence Bromfeld and Carole Ann Bromfeld, have been living at 48 Wingate Drive, Livingston, New Jersey, since February of 1970. Their house is a typical two-story suburban

---

[1] Harleysville is the parent company of Huron.

design. On January 28, 1994, Mrs. Bromfeld returned home to find that her basement was flooded and various items, including furniture, were floating in the water. Upon closer inspection, Mrs. Bromfeld determined that the water was approximately one-foot deep. She also noticed that the entire rear exterior wall had caved into the basement, and that the ceiling on the same side of the basement was down and the lighting fixtures were hanging from the ceiling. Plaintiffs moved out of the house for almost seven months and lived elsewhere until the damage was repaired.

On January 27, 1994 at 1:00 a.m. there had been seven inches of snow cover which was reduced to one inch from the rain and above-freezing temperatures. Although it had been raining the following morning, it was not raining at the time that Mrs. Bromfeld made her observations.

Plaintiffs made a claim under the Policy. Defendants did not deny the claim nor honor it. On July 22, 1994, plaintiffs filed a complaint in the Superior Court seeking compensatory and punitive damages for defendants' breach of the Policy and their covenant of good faith. No answer was filed to the complaint until December 6, 1994. In the interim, on August 19, 1994, plaintiffs demanded an appraisal of their loss pursuant to the terms of their insurance policy. When no response was made, on October 20, 1994, plaintiffs filed a motion to compel the appraisal. In March 1995 the defendants complied.

The defendants' appraiser and the plaintiffs' appraiser agreed on the building loss of $85,631.92, personal property loss of $7,520 and a loss of use of the premises of $14,000, for a total loss of $107,151.92. The plaintiffs' expert, John J. Hare, was deposed and testified that:

[T]he wall collapsed due to the additional loads applied eccentrically to the foundation wall due to the installation of the wood deck combined with the unusually high snow/ice loads coupled with wind. The wall collapsed catastrophically due to the lack of any available tensile bond strength of the interior shell of the masonry.

In his report Hare stated:

Due to the nature of the construction of wood frame exterior bearing walls, roof wind and snow floor loads, as well as wall wind loads, are transmitted eccentrically

to the foundation wall. This generates bending stresses, both tension and compression, in the foundation wall which must be counteracted by internal resistance within the wall. The wall is acting as a beam/column with an eccentrically applied vertical load. The lack of mortar bond at the interface of the 8" to 12" transition prevented the wall from developing an internal couple to resist the eccentrically applied loads. The addition of the exterior deck magnified the above problem in that the surcharge snow drift load which would normally accumulate at the ground level 2½ to 3 feet below the mud sill, was transferred by the ledger board of the deck to the header at the face of the first floor joists, applying this additional load eccentrically to the 8" masonry upper course. It is my professional opinion that the failure [was] initiated at the upper portion of the wall which fell inward to hit and be restrained by the interior wood stud wall. This caused the wall to crack at the base which then slid inward kicking out the bottom of the stud wall.

The defendants' expert, Henry R. Naughton, attributed the collapse to underground soil pressure on the rear foundation wall, specifically indicating in his report that the collapse was "the result of excessive lateral loading from the wet soil and not as a consequence of eccentric loading from the deck." He concluded that the wall collapsed "as a result of rain and warmer temperatures, water infiltrated the soil increasing the lateral pressure against the wall and decreasing the soil strength. The increased wet soil lateral pressure caused the wall to fail and the decreased soil strength resulted in a soil shear failure driving a soil wedge into the basement area." Although defendants sent their expert to examine the premises within five days of the loss, they never advised plaintiffs whether the loss would be paid.

Defendants moved for summary judgment to dismiss plaintiffs' complaint. Plaintiffs opposed the motion and cross-moved for summary judgment. After hearing argument, the trial court ruled from the bench that the Policy violates the New Jersey Plain Language Law, *N.J.S.A.* 56:12-1 to -13, and the reasonable expectations doctrine. An order granting summary judgment to the plaintiffs against defendants in the amount of $107,151.92 together with prejudgment interest in the amount of $3,745, for a total of $110,896.92 was entered on March 15, 1996.

On March 28, 1996, defendants filed a notice of appeal. On April 2, 1996, the trial court filed a fourteen-page supplemental written opinion.

## I.

On appeal, defendants argue that the trial court erred in two respects. First, the court improperly found that the Policy violated the Plain Language Law and that defendants were liable thereunder. Second, the court failed to grant summary judgment in favor of the defendants.

Defendants argue that the trial court's decision which awarded summary judgment to plaintiffs was based solely on the grounds that the Policy violated the Plain Language Law. Although the trial court relied upon the applicability of the reasonable expectations doctrine to this case in its opinion from the bench, when it thereafter issued a supplemental written opinion, it stated: "Summary judgment was granted at oral argument in favor of the plaintiffs, solely upon New Jersey's Plain Language Statute." However, in any event, a trial court's judgment can be affirmed on any grounds applicable, whether or not used by the court below. *See Isko v. Planning Board of Livingston*, 51 *N.J.* 162, 175, 238 *A.*2d 457 (1968); *Yun v. Ford Motor Co.*, 276 *N.J.Super.* 142, 647 *A.*2d 841 (App.Div.1994), *rev'd on other grounds*, 143 *N.J.* 162, 669 *A.*2d 1378 (1996); *Walker v. Briarwood Condo. Ass'n.*, 274 *N.J.Super.* 422, 644 *A.*2d 634 (App.Div.1994); *Liebeskind v. Mayor and Municipal Council of Bayonne*, 265 *N.J.Super.* 389, 627 *A.*2d 677 (App.Div.1993).

Under the Plain Language Law, defendants argue that they are entitled to a finding of no liability pursuant to *N.J.S.A.* 56:12–5. Section 5 of the Plain Language Law protects an insurer from liability under that statute where the insurer has followed (or relied upon a predecessor having followed) the established procedure for obtaining "plain language" approval of a policy form. It provides as follows:

**Nonliability Conditions**

There shall be no liability under sections 3 and 4 if: a. both parties to the contract have performed their obligations under the contract, b. the creditor, seller, insurer or lessor attempts in good faith to comply with this act in preparing the consumer contract, c. the contract is in conformity with a rule, regulation, or the opinion or interpretation of the Attorney General or the Commissioner of Insurance,

in regard to contracts of insurance provided for in subsection c. of section 1 of this act (C. 56:12–1c), or d. the consumer supplied the contract or the portion of the contract to which the consumer objects.

[*N.J.S.A.* 56:12–5 (emphasis supplied).]

As provided by subsection (c) of Section 5, an insurer cannot be liable under Sections 3 or 4 (*N.J.S.A.* 56:12–3 and 4) if the policy it issued is in "conformity with a rule, regulation, or the opinion or interpretation ... of the Commissioner of Insurance."

Furthermore, Section 8 provides that the Commissioner of Insurance ("Commissioner") may certify policies such as the Policy in question, and, at subparagraph (d), provides:

Any consumer contract certified pursuant to this section is deemed to comply with this act. Certification of a consumer contract pursuant to this section is not otherwise an approval of the contract's legality or legal effect.

[*N.J.S.A.* 56:12–8d.]

The two sections clearly anticipate the promulgation by the Commissioner of regulations regarding approval of policy forms under the statute, and explicitly protects insurers relying on approved forms.

Pursuant to *N.J.S.A.* 56:12–1 to –13, the Commissioner promulgated regulations pertaining to the implementation of the Plain Language Law, codified at *N.J.A.C.* 11:2–18 *et seq.*, which, in effect, provide that defendants had no obligation to obtain independent certification from the Commissioner as to the Policy's compliance with the Plain Language Law. As stated in Section 11:2–18.5(e) of the New Jersey Administrative Code:

Pursuant to *N.J.S.A.* 56:12–5, an insurer need not request an opinion as to compliance with the Plain Language Law for policy forms identical to those which have already been certified for some other insurer or rating organization.

Pursuant to the Plain Language Law and procedures established by the Commissioner, the HO–3 policy form (which comprises the bulk of the coverage terms and conditions of the Policy) was approved by the Commissioner and adopted by defendants for use. It is not in dispute that the policy terms to which plaintiffs object are part of the form so approved. The Office of the Commissioner confirmed that the HO–3 policy form in question

had been submitted by the Insurance Services Organization with the appropriate request for Plain Language Certification, and that the policy form was subsequently approved. Although the Office of the Commissioner did not provide the form or correspondence which specifically approved the policy form, it stated: "As you will note, the matter was not specifically addressed, but appears subsumed in the general approval of the filing in December 1986."

Plaintiffs argue that the entire Policy, as assembled, should have been submitted to the Commissioner for statutory approval. Again, such a requirement would negate the effect of the statute which protects subsequent insurers when they use an approved form. The Code and statute read together clearly do not antici- pate such submission and resubmission *ad infinitum*.

In this case, the statute specifically anticipates the Commission- er's regulations on this precise issue; the regulations are on their face within the authority delegated, and the regulations are pre- sumptively valid. *Medical Society of New Jersey v. Dept. of Law & Public Safety*, 120 *N.J.* 18, 25, 575 *A.*2d 1348 (1990). As such, plaintiffs bear the burden of demonstrating that the regulations are not valid.

The statutory and administrative framework protects defen- dants from liability under the Plain Language Law, and plaintiffs have failed to show that the Commissioner's regulations are not valid.

## II.

Compliance with the Plain Language Law does not, howev- er, automatically preclude liability of an insurance company based upon the terms of its policy. A court reviewing a consumer contract, such as an insurance policy, may reform or limit a provision so as to avoid an unfair result if it finds that "the violation caused the consumer to be substantially confused about any of the rights, obligations or remedies of the contract." *N.J.S.A.* 56:12–4.1b.

The defendants argue that the Policy is unambiguous, and is crafted to explain the coverage provided in as clear a fashion as possible. They argue that the Policy provided certain defined collapse coverage to the plaintiff's dwelling at "Section I—Perils Insured Against" which provides:

**COVERAGE A—DWELLING and**

**COVERAGE B—OTHER STRUCTURES**

We insure against risks of direct loss to property described in Coverages A and B only if that loss is a physical loss to property; however, we do not insure loss:

1. involving collapse, other than as provided in Additional Coverage 8.

[SECTION I—PROPERTY COVERAGES]

The Section entitled "Additional Coverages" begins at page 3, and contains eight numbered subparts. Number 8 of "ADDITIONAL COVERAGES" is labeled, in bold print, "Collapse." It provides:

**8. Collapse.** We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:

a. Perils Insured Against in Coverage C—Personal Property. These perils apply to covered building and personal property for loss insured by this additional coverage;

b. hidden decay;

c. hidden insect or vermin damage;

d. weight of contents, equipment, animals or people;

e. weight or rain which collects on a roof; or

f. use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items b, c, d, e and f unless the loss is a direct result of the collapse of a building.

Collapse does not include settling, cracking, shrinking, bulging or expansion.

This coverage does not increase the limit of liability applying to the damaged covered property.

Under "ADDITIONAL COVERAGES" 8, the Policy again refers to another policy section, incorporating additional covered causes of collapse.

Defendants argue that the section referenced, "Perils Insured Against in Coverage C—Personal Property" is clearly identified and labeled, and is on page 6, the following page. Defendants argue further that this cross-reference reveals that the Policy is structured so as not to contradict itself because the Policy takes care to **include** this coverage, so that a policy holder's collapse coverage and personal property coverage conform with one another with respect to the perils insured against. To the extent that these provisions are "exceptions to exceptions," defendants assert that they are clear and necessary to the efficient explication of collapse coverage.

At his deposition, plaintiffs' expert testified that the collapse was caused, in part, by improper methods of construction. Defendants, therefore, argue that plaintiffs adopted below the theory of causation offered by defendants' expert, namely underground soil pressure, caused by water saturation far from the house, and water pressure is in turn excluded from coverage. Thus, defendants contend that regardless of which of plaintiffs' theories is correct, or if both evaluations are in part correct, or if defendants' expert alone is correct, there is no coverage.

In addition, defendants argue that none of the proffered causes of collapse are covered. Specifically they assert that even if plaintiffs' expert's cause of collapse is accepted, it was an excluded loss, and therefore not covered by the Policy. In addition, the Policy contains the following exclusion:

1. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

\*    \*    \*    \*    \*    \*    \*    \*

c. **Water Damage,** meaning:

(1) flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

(2) water which backs up through sewers or drains; or

(3) water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

\*     \*     \*     \*     \*     \*     \*     \*·

However, as plaintiffs note under "COVERAGE C—PERSONAL (sic) PROPERTY" it states:

### "COVERAGE C—PERSONAL PROPERTY"

We insure for direct physical loss to the property described in Coverage C caused by a peril listed below unless the loss is excluded in Section 1—Exclusions.
. . .
11. Weight of ice, snow or sleet which causes damage to a building or property contained in the building."

## III.

Looking at the policy itself, there may be a basis for coverage. "Section I," which defines the perils insured against, appears on page five of fifteen pages. The introductory language of this section first grants coverage, but then there are several exceptions, the last of which incorporates additional "Section I–Exclusions", which appears two pages later. The first of the exceptions contained within the "Perils Insured Against" portion of Section I states that the company does not insure against a loss "involving collapse, other than as provided in Additional Coverage 8." Although this coverage appears on the same page, to find out where the additional coverages start one must look through the entire policy. Instead of proceeding forward, however, one must first go back two pages to find the heading "Additional Coverages," and then go forward to find that coverage 8 was, in fact, on the same page as the "Perils Insured Against."

There are a variety of clauses providing coverage for collapses, the first of which is located under "Perils Insured Against" in Coverage C–Personal Property. Moving ahead one page to that provision, the reader sees that one of the perils insured against for personal property is number 11 "weight of ice, snow or sleet which causes damage to a building or property contained in the build-

ing." Plaintiffs' expert determined that the recent construction of a deck transmitted the weight of ice and snow onto the house frame immediately above the foundation, and that pressure upon the exterior face of the wall (as opposed to proper downward pressure on the center of the wall) had a tendency to push the wall inward, ultimately causing the wall to collapse. Defendants focus upon this as a construction error. However, if the actual collapse was caused by the weight of ice or snow, the provision of the policy just noted would appear to cover plaintiffs.

Defendants' expert, McNaughton, found no excessive loading, but rather that increased wet soil lateral pressure caused the wall to fail. Specifically, decreased soil strength resulted in a soil shear failure that drove a soil wedge into the basement area. The soil pressure which itself had been caused by the movement of water over fifty feet from the house (as McNaughton claims) should not, however, constitute "water damage" within the policy exclusions, nor can it be qualified as water pressure on the foundation, as indicated under the noninsurance exceptions in the "Perils Insured Against" provision 2b(2). In fact, there is some question whether a collapse which has been caused by the expansion or bulging of the foundation due to exterior pressure of the soil falls within the term "collapse" of the Policy. This court notes that the Policy contains a provision stating that "[c]ollapse does not include settling, cracking, shrinking, bulging or bracket expansion."

While defendants' theory most probably does not fall within the covered collapses of a building, it also does not fall within any exclusion or exceptions to a peril insured against. Thus, if the collapse was attributed to this extraneous factor combined with the factor of the weight of the ice transmitted through the deck to the outside face of the upper blocks of the foundation wall, then plaintiffs would be covered.

■ There may be a basis for coverage here, depending upon the testimony of the experts upon which a jury may base its findings as to the cause of the loss. If there is need for any

interpretation for this "plain language" Policy, the trial court can do so. Exclusions are scattered throughout the policy and are difficult to find. For instance, collapse is a covered risk and the exceptions seem to be buried. Defendants' expert presents a cause that is not included, but apparently is not excluded, and thus it may be combined with an included cause to create liability.

The natural assumption of a homeowner when he or she purchases a homeowner's policy is to assume that he or she is covered by a comprehensive policy that will protect him or her from an unexpected event, such as a basement collapse. *See Campbell v. Norfolk & Dedham Mut. Fire*, 682 A.2d 933 (R.I.1996) (material issue of fact as to whether collapse of portion of basement wall was covered under homeowner's policy was raised by ambiguity of material terms employed in homeowner's policy where ordinary purchaser of policy could have reasonably understood its provisions as insuring against such collapse, even if exclusion required that any loss to foundation result from complete collapse of building.)

## IV.

Plaintiffs contend that their loss is covered under the Policy and, in the alternative, liability should attach under the reasonable expectations doctrine. It has often been stated that "[Insureds] are entitled to the broad measure of protection necessary to fulfill their reasonable expectations [and they] should not be subjected to technical encumbrances or to hidden pitfalls. . . ." *Kievit v. Loyal Protective Life Ins. Co.*, 34 *N.J.* 475, 482, 170 A.2d 22 (1961).

> While insurance policies . . . are contractual in nature, they are not ordinary contracts but are "contracts of adhesion" between parties not equally situated. . . . The company is expert in its field and its varied and complex instruments are prepared by it unilaterally whereas the assured or prospective assured is a layman unversed in insurance provisions and practices. He justifiably places heavy reliance on the knowledge and good faith of the company and its representatives and they, in turn, are under correspondingly heavy responsibility to him. His reasonable expectations in the transaction may not justly be frustrated and courts

have properly molded their governing interpretative principles with that uppermost in mind.

[*Allen v. Metropolitan Life Insurance Co.*, 44 *N.J.* 294, 305, 208 *A.*2d 638 (1965) (citations omitted).]

An insurance policy is a contract. However, "while insurance policies are contractual in nature, they are not ordinary contracts but contracts of adhesion between parties who are not equally situated." *Meier v. New Jersey Life Insurance Co.*, 101 *N.J.* 597, 611, 503 *A.*2d 862 (1986). Even the most astute insured must find his or her "bargaining power is necessarily limited." *Zuckerman v. National Union Fire Ins. Co.*, 100 *N.J.* 304, 320, 495 *A.*2d 395 (1985). Insurance policies are often unilaterally "prepared by the company's experts, [persons] learned in the law of insurance who serve its interest in exercising their draftsmanship art. The result of their effort is given to the insured in printed form upon the payment of his premium." *Mazzilli v. Acc. and Cas. Insurance Co. of Winterthur*, 35 *N.J.* 1, 7–8, 170 *A.*2d 800 (1961). Moreover, insurance contracts are not typically read or reviewed by the insured, whose understanding is often impeded by the complex terminology used in the standardized forms. *See Gaunt v. John Hancock Mutual Life Insurance Co.*, 160 *F.*2d 599, 601 (2d Cir.), *cert. den*, 331 *U.S.* 849, 67 *S.Ct.* 1736, 91 *L.Ed.* 1858 (1947).

Because of the unique nature of contracts of insurance, courts assume "a particularly vigilant role in ensuring their conformity to public policy and principles of fairness." *Voorhees v. Preferred Mut. Ins. Co.*, 128 *N.J.* 165, 175, 607 *A.*2d 1255 (1992). To further that end, New Jersey courts often have construed ambiguous language in insurance policies in favor of the insured and against the insurer. *Sears Mortgage Corp. v. Rose*, 134 *N.J.* 326, 347, 634 *A.*2d 74 (1993); *Walker Rogge, Inc. v. Chelsea Title & Guar. Co.*, 116 *N.J.* 517, 529, 562 *A.*2d 208 (1989); *Sandler v. New Jersey Realty Title Ins. Co.*, 36 *N.J.* 471, 479, 178 *A.*2d 1 (1962); *Matits v. Nationwide Mut. Ins. Co.*, 33 *N.J.* 488, 495, 166 *A.*2d 345 (1960); *Hunt v. Hospital Serv. Plan*, 33 *N.J.* 98, 102, 162 *A.*2d 561 (1960). Consistent with that principle, courts also have endeavored to interpret insurance contracts to accord with the objectively reasonable expectations of the insured. "Recognizing the position of laymen with respect to insurance policies prepared and marketed by the insurer, our courts have endorsed the principle of giving effect to the 'reasonable expectations' of the insured for the purpose of rendering a 'fair interpretation' of the boundaries of insurance coverage." *Di Orio v. New Jersey Mfrs. Ins. Co.*, 79 *N.J.* 257, 269, 398 *A.*2d 1274 (1979). The insured's "reasonable expectations in the

transaction may not justly be frustrated and courts have properly molded their governing interpretative principles with that uppermost in mind." *Allen v. Metropolitan Life Ins. Co.*, 44 *N.J.* 294, 305, 208 *A.*2d 638 (1965). Moreover, we have recognized the importance of construing contracts of insurance to reflect the reasonable expectations of the insured in the face of ambiguous language and phrasing, *see State, Dep't. of Envtl. Protection v. Signo Trading Int'l.*, 130 *N.J.* 51, 62, 612 *A.*2d 932 (1992), and in exceptional circumstances, when the literal meaning of the policy is plain. *See Werner Indus. v. First State Ins. Co.*, 112 *N.J.* 30, 35–36, 548 *A.*2d 188 (1988) ("At times, even an unambiguous contract has been interpreted contrary to its plain meaning so as to fulfill the reasonable expectations of the insured. . . ."); *Sparks v. St. Paul Ins. Co.*, 100 *N.J.* 325, 338, 495 *A.*2d 406 (1985); *Gerhardt v. Continental Ins. Cos.*, 48 *N.J.* 291, 297–99, 225 *A.*2d 328 (1966). [*Doto v. Russo*, 140 *N.J.* 544, 556–557, 659 *A.*2d 1371 (1995).]

The reasonable expectations doctrine urged by the plaintiffs applies to insurance policies with private individuals. *Nunn v. Franklin Mutual Insurance Co.*, 274 *N.J.Super.* 543, 550, 644 *A.*2d 1111 (App.Div.1994). In this case, where the Policy is designated as a homeowners policy of insurance, plaintiffs argue that they expected to be covered under the Policy for damages caused by the failure of a wall which allows the outside backyard to come into the basement. This was a catastrophic loss that no average person would expect to happen and the loss is devastating to them. They argue that the purported exclusion was not conspicuous and clear, and the average layman would have no understanding about the apparent attempt to exclude what obviously should have been included in the Policy, if the exclusion applies at all. In fact, defendants' appellate counsel did not even know if any insurance company issues a policy which would cover the loss sustained by plaintiffs.

In *Bauman v. Royal Indemnity Co.*, 36 *N.J.* 12, 21, 174 *A.*2d 585 (1961), the Court stated:

In all fairness to the ordinary layman who is the average insured, an exclusion clause should be so prominently placed and so clearly phrased that "he who runs can read." *See* Lord St. Leonard in *Anderson v. Fitzgerald*, 4 *H.L.C.* 484, 510, 10 *Eng. Rep.* 551, 561 (1853).

In *Gerhardt v. Continental Ins. Cos.*, 48 *N.J.* 291, 225 *A.*2d 328 (1966), the Court noted that previously in *Bauman*, it had stated "approval of the holding in *Gunther v. Metropolitan Cas. Ins. Co.*, 33 *N.J.Super.* 101, 109 *A.*2d 485 (Law Div.1954), wherein

the company had deliberately described its policy in sweeping terms as a comprehensive personal liability policy, and had sold it as such, and that while it had the legal right to exclude particular types of liability, its responsibility was to do so unequivocally. We noted that fairness to the ordinary layman who is the average insured dictates that exclusions be "so prominently placed and so clearly phrased that 'he who runs can read.'"

[*Gerhardt*, 48 *N.J.* at 295–96, 225 *A.*2d 328 (citations omitted).]

■  Our Supreme Court has often stated that the fundamental principle of insurance law is to fulfill the objectively reasonable expectation of the parties.  At times, even an unambiguous contract has been interpreted contrary to its plain meaning so as to fulfill the reasonable expectations of the insured.  *Werner Industries, Inc. v. First State Ins. Co.*, 112 *N.J.* 30, 35–36, 548 *A.*2d 188 (1988).  In *Sparks v. St. Paul Ins. Co.*, 100 *N.J.* 325, 495 *A.*2d 406 (1985), the Court expounded upon its philosophy of according the reasonable expectations of the insured in interpreting insurance policies, whether there is ambiguity or not.  Since understanding of the contract through consent and negotiation rarely exists, one cannot assume that traditional contract consent applies with insurance contracts.  The *Sparks* Court then states that:

Such consent can be inferred only to the extent that the policy language conforms to public expectations and commercially reasonable standards.... In instances in which the insurance contract is inconsistent with public expectations and commercially accepted standards, judicial regulation of insurance contracts is essential in order to prevent over-reaching and injustice.

[*Sparks*, *supra*, 100 *N.J.* at 338, 495 *A.*2d 406 (citations omitted).]

In quoting from R. Keeton, "Insurance Law Rights at Variance With Policy Provisions," 83 *Harv. L.Rev.* 961, 967 (1970), the *Sparks* Court said:

The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations.

[*Id.* at 338–39, 495 *A.*2d 406.]

The doctrine of reasonable expectations and the granting of coverage even where the company never intended coverage, was best described in *Weedo v. Stone–E–Brick, Inc.*, 81 *N.J.* 233, 405 *A.*2d 788 (1979).  The Court observed:

We conceive a genuine ambiguity to arise where the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage. In that instance, application of the test of the objectively reasonable expectation of the insured often will result in benefits of coverage never intended from the insurer's point of view. The benefits granted, however, will pertain to the same landscape of risk as contemplated by the policy in issue, that is, the "doctrine of ambiguity" works to effectuate the consumer's expectation that the policy purchased extended greater coverage in the particular underwriting area.

[*Id.* at 247, 405 A.2d 788].

Finally, our Supreme Court stated the general rule of construction in searching for the reasonable expectations of the insured as follows:

Our expressions have come in a variety of issues and contexts, but all have indicated as their keystone the goal of greater protection to the ordinary policyholder untutored in the intricacies of insurance. We have realistically faced up to the fact that insurance policies are complex contracts of adhesion, prepared by the insurer, not subject to negotiation, in the case of the average person, as to terms and provisions and quite unintelligible to the insured even were he to attempt to read and understand their unfamiliar and technical language and awkward and unclear arrangement.... We have stressed, among other things, the aim that average purchasers of insurance are entitled to the broad measure of protection necessary to fulfill their reasonable expectations; that it is the insurer's burden to obtain, through its representatives, all information pertinent to the risk and the desired coverage before the contract is issued; and that it is likewise its obligation to make policy provisions, especially those relating to coverage, exclusions and vital conditions, plain, clear and prominent to the layman.

[*Harr v. Allstate Ins. Co.*, 54 N.J. 287, 303–304, 255 A.2d 208 (1969).]

As the Supreme Court in *Sparks* found that the policy of insurance did not reach the expectations of a reasonable insured and so construed a clear policy against the insurance company and found coverage, so too the trial court herein must look at the reasonable expectations of the average home owner if the court finds that the Policy does not specifically insure this loss, and whether the reasonable expectations of the insureds is that their homeowner's policy covers them for such a catastrophe. Under all the circumstances, depending upon the factual determination as to the cause of the collapse, the trial court has to determine if coverage should be afforded to the plaintiffs under the reasonable expectations doctrine.

As there is a bonafide dispute as to the cause of the collapse, that issue must be resolved by a jury as demanded by the plaintiffs in their complaint. Thereafter, it will be up to the trial court to interpret of the Policy, *Weedo v. Stone–E–Brick, Inc.,* 155 *N.J.Super.* 474, 479, 382 *A.2d* 1152 (App.Div.1977), *rev'd on other grounds,* 81 *N.J.* 233, 405 *A.2d* 788 (1979), and, if necessary, the reasonable expectations of the insureds (plaintiffs).

We also note that if a homeowner is not covered for such a loss, he or she very well may have a claim against his or her insurance broker or agent for failing to obtain such coverage or, at least, for failing to advise the homeowner as to the availability of such coverage. Furthermore, there is nothing in the record to show that such coverage is even available.

Reversed and remanded for further proceedings consistent with this opinion.