753 A.2d 176 (2000)
332 N.J. Super. 250
FANTIS FOODS, INC., Plaintiff-Appellant,
v.
NORTH RIVER INSURANCE COMPANY, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued September 23, 1999.
Decided June 27, 2000.
*177 David W. Field, for plaintiff-appellant (Lowenstein Sandler, attorneys; Mr. Field, on the brief).
Donald G. Sweetman, Parsippany, for defendant-respondent (Tell, Cheser & Breitbart, attorneys; Mr. Sweetman, on the brief).
Before Judges STERN, KESTIN and STEINBERG.
The opinion of the court was delivered by KESTIN, J.A.D.
This is a declaratory judgment action for insurance coverage. On cross motions for summary judgment, the trial court held that New York law governed and that, under the substantive standards of that state in respect of a single issue, plaintiff could not prevail. Accordingly, an order was entered granting defendant's motion for summary judgment, denying plaintiff's motion, and dismissing the complaint. Plaintiff appeals, arguing only that the motion judge erred in granting defendant's motion. Although we agree with the motion judge's determination that New York law governed the single issue before him, we disagree that New York law required a ruling in defendant's favor. Accordingly, we reverse and remand for further proceedings.
Both parties maintain their principal offices in New Jersey and both conduct business in New York. The general liability policy in question was sold to plaintiff in New York by a New York "producer". It was issued on a renewal basis for the period from August 5, 1995 to August 5, 1996, providing multi-peril, "all risks" coverage for plaintiff's buildings in several states. One of the covered buildings, vacant at the time the risk materialized, is in Manhattan. The underlying issue is whether the policy covers the imminent collapse of that New York City structure.
*178 Plaintiff represents that it seeks a judgment of $123,506.38 for repair costs, plus attorneys' fees, interest and costs. We note that plaintiff's "claims for extra-contractual damages, including consequential damages, punitive damages and attorney's fees" were dismissed without prejudice in a consent order entered early in the pendency of the matter.
We agree with the trial court's ruling that, in general, to the extent a difference in substantive law rule between New York and New Jersey is established on the issue before it, see Pfizer, Inc. v. Employers Ins. of Wausau, 154 N.J. 187, 199, 712 A.2d 634 (1998)(a choice of law decision is necessary "`only ... when the laws of the involved states differ on the point in issue'")(quoting Robert A. Sedler, A Real World Perspective on Choice of Law, 48 Mercer L.Rev. 781, 783 (1997)), that issue must be seen to be governed by New York law.
There are two primary arguments for favoring the choice of New Jersey law. The first is based on the connection each of the parties has with New Jersey as a business domicile, and bears upon this State's interest in ruling the relationships and responsibilities of entities subject to its regulatory sway. The second is grounded upon the fact that the policy at issue covers plaintiff's properties in several states, a factor that tends to weigh in favor of a uniform-contract-interpretation approach to choice of law determinations over a site-specific approach. See Gilbert Spruance Co. v. Pennsylvania Mfrs., 134 N.J. 96, 104, 629 A.2d 885 (1993) (where the insurance policy covers a group of risks that are scattered throughout two or more states, the location of any one risk has diminished significance). Although the Supreme Court employed a site-specific approach in Spruance, as well as in a number of other recent cases having to do with losses from environmental damage, all those cases involved special considerations that do not apply here. See Pfizer, supra, 154 N.J. at 207-08, 712 A.2d 634 (holding that, in the event of conflict, the "law of the waste site would appear to have the more dominant significant relationship"); Spruance, supra, 134 N.J. at 110-13, 629 A.2d 885 (approving of the idea that commerce would be encouraged by applying the law of the state where toxic waste is deposited and stating that in situations involving foreseeably multistate operations, the "governing law is that of the state with the dominant significant relationship according to the principles of Restatement section 6"). Nevertheless, in the instant matter, given the lack of a choice-of-law provision in the insurance policy, and even regarding the preference in favor of uniform-contract-interpretation approaches to be one of general applicability, all significant party-oriented considerationssave for the fact that both parties do business in New Jersey as well as in New Yorkhave a New York focus.
The Restatement (Second) of Conflict of Laws (1971) provides the general choice of law factors to be applied where a claim springs from a contract:
§ 188. Law Governing in Absence of Effective Choice by the Parties
(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.
(2) In the absence of an effective choice of law by the parties ..., the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
(a) the place of contracting,
(b) the place of negotiation of the contract,
(c) the place of performance,
(d) the location of the subject matter of the contract, and
(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

*179 These contacts are to be evaluated according to their relative importance with respect to the particular issue.
(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189-199 and 203.
Applying the type of reasoning used in the flexible governmental interest analysis approach required for resolving other like questions, see Veazey v. Doremus, 103 N.J. 244, 247, 510 A.2d 1187 (1986) (dealing with tort cases); State Farm Mut. Auto. Ins. Co. v. Estate of Simmons, 84 N.J. 28, 34-37, 417 A.2d 488 (1980) (recognizing Restatement §§ 6 and 188 as the source of the "most significant relationship test", and that said test, sharing certain factors with the governmental interest analysis, applies in contract actions), we conclude that New York's connection with the subject matter and the risks it engenders is far more extensive and qualitatively meaningful in the practical sense than is New Jersey's association with the parties simply because they are business domiciliaries. The omnibus factors to be applied in evaluating the various levels of relationship which are pertinent to the flexible governmental interest analysis approach are also set out in the Restatement:
§ 6. Choice-of-Law Principles
* * *
(2) ...
(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.
We observe that even if no feature of this case strongly suggested that the law of one state or the other governed under the Restatement`s choice-of-law tests, no real interest of either of the parties would impel a particular conclusion, apart from a more or less hospitable approach to plaintiff's claim stemming from whatever differing policies and viewpoints may pertain in the two states. See, e.g., Permacel v. American Ins. Co., 299 N.J.Super. 400, 411, 691 A.2d 383 (App.Div.1997). As noted by the trial court, even if there were an essential equipoise in factors bearing upon the choice of law determination, the preference for New York law would be buttressed by an insurance-specific provision of the Restatement which establishes "the principal location of the insured risk" as the paramount evaluative standard in the absence of a more significant relationship to another state.
§ 193. Contracts of Fire, Surety or Casualty Insurance
The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.
See, e.g., Pfizer, supra, 154 N.J. at 199, 712 A.2d 634 (the satisfaction of the "justified expectations" of the parties and "their need[ ] for predictability of result ... are basic purposes of contract law, especially insurance law"); HM Holdings Inc. v. Aetna Cas. & Sur. Co., 154 N.J. at 214, 216, 712 A.2d 645 (1998) (addressing the need to balance the public policy concerns of the forum state and the domestic concerns of *180 the state in which the contract was formed and performed); Pharmacia v. American Ins. Co., 316 N.J.Super. 161, 165, 719 A.2d 1265 (App.Div.1998) (factors to be considered are "the competing interests of the states involved, the national interests of commerce among the states, the interests of the parties and the interests underlying contract law, and the interests of judicial administration"); Harrow Stores Inc. v. Hanover Ins. Co., 315 N.J.Super. 547, 553, 719 A.2d 196 (App.Div.1998) (illustrating how the appropriate factors are to be balanced); Permacel, supra, 299 N.J.Super. at 411, 691 A.2d 383 (same); J. Josephson v. Crum & Forster, 293 N.J.Super. 170, 188-190, 679 A.2d 1206 (App.Div.1996) (same); see also Unisys Corp. v. Insurance Co. of North America, 154 N.J. 217, 223, 712 A.2d 649 (1998) (same).
Notwithstanding New Jersey's undeniable interest in protecting the rights of its insureds and in promoting responsiveness on the part of its insurers, those "wholly domestic" concerns, see HM Holdings, supra, 154 N.J. at 214, 712 A.2d 645the only such factors in the case pertaining to New Jerseyhave considerably less weight than the interests of New York in the condition, maintenance and repair of structures within its borders; the respective responsibilities, financial and otherwise, of property owners and insurers with respect thereto; and relevant considerations of hazard, sequence and causation when collapse occurs or is threatened. See Pharmacia, supra, 316 N.J.Super. at 164-166, 719 A.2d 1265 (noting that bright line rules have been rejected and that a case-by-case analysis of the factors prescribed in Restatement § 6 is required). Thus, we conclude, essentially for the same reasons employed by the trial court judge, that if and where a difference of law exists, the law of New York governs in the absence of special considerations suggesting a different view as to particular issues.
The focal question of whether different rules of law pertain in the two jurisdictions cannot be answered without first identifying the prevailing rule in each separately as to every genuine issue in the case. See Johnson Matthey Inc. v. Pennsylvania Mfrs. Ass'n Ins. Co., 250 N.J.Super. 51, 65, 593 A.2d 367 (App.Div.1991) ("Conflicts principles do not dictate that all legal issues presented by a single case should be decided under the laws of a single state. The evaluation of significant relationships and governmental interests takes place issue by issue and can lead to the application of different bodies of law."); see also Veazey, supra, 103 N.J. at 248, 510 A.2d 1187 ("Any such conflict is to be determined on an issue-by-issue basis."); 4 Eric Holmes, Appelman on Insurance § 21.1, at 226 (2d ed.1998). An understanding of the significant underlying facts in the matterlargely uncontested for summary judgment purposesis critical toward this end.
At the "owner's" request, a masonry consultant for the New York City Brickwork Design Center, Michael Gurevich, inspected the property on August 12, 1996. His report noted that the property had previously been inspected for the New York City Department of Buildings in February 1992, that the inspection had covered "[t]he north and south walls, and 25 feet returns at east and west walls[,]" and that the report of that inspection "had noted no critical conditions ... and status of exterior maintenance was note[d] as `good'." As a result of his inspection in 1996, Gurevich prepared a report in which he described in detail a number of cracks, displacements and other defects he had found, including "[r]usted steel ... behind the displaced part of the south wall." He also concluded that the north elevation "parapet wall is at the verge of collapse[,]" and that at "[t]he base of [the east] parapet wall ... [he] observed severely rusted steel lintels which are causing unsafe wall conditions," resulting in the possibility that the "parapet wall could collapse." The "analysis" section of his report contained the following observations:
The main cause of the parapet walls [sic] displacement and imminent collapse is *181 hidden decay of steel beams and lintels which are located inside or behind the brick masonry walls. * * *
North wall parapet has the emergency condition. The corbel brick masonry cornice has more than 2 inches of displacement out from the wall plain [sic]. The weight of the brick parapet wall located above the corbel cornice is holding this displaced corbel brick cornice in place. Any soil shake or movement could be translated through the foundations to the north wall which could cause collapse of the wall parapet. The building is located within a few hundred feet of the entrance to the Holland Tunnel, which is a main route for heavy truck traffic. Thus, no risk should be taken and the north wall parapet should be removed and rebuilt.
Similar conditions were observed at the south wall parapet.... [R]usted steel was observed.... The elevator ... could translate additional vibration to the parapet wall. Thus, the south wall parapet should be removed down to the 7th floor window head level and should be rebuilt including replacement of rusted steel beams and lintels.... [The] south elevator bulkhead walls should be rebuilt at the same time as the parapet wall.
The middle part of the east parapet wall has similar conditions.... [The] displaced middle part of the east parapet wall should be rebuilt.
The Gurevich report concluded: "It is ... possible ... that additional prevention actions could be identified as corrective work progresses."
Plaintiff immediately undertook to make repairs to the building, allegedly incurring an eventual total of $123,506.38 in costs. Plaintiff filed a claim under the policy with defendant on August 27, 1996. Defendant engaged a building consultant, C.J. Rubino, to investigate the "[c]ause and [o]rigin of an `alleged collapse'." The Rubino report, dated September 17, 1996, verified the conditions outlined in the Gurevich report, and opined:
[T]he observed conditions ... were caused by a combination of exposure to the elements and the delaminating of the steel lintels which expanded, causing the brickwork movement. This condition was due, for the most part, to the absence of maintenance, and although there is no evidence of any actual collapse, if the conditions are not addressed, failure would be inevitable. It is important to note that all of the movement found was and still is continuous over a long period of time, and that these various points of failure were openly visible and would have been detected during normal site inspections.
By letter of October 22, 1996, defendant disclaimed liability under the policy, invoking stated exclusions for
d. (1) Wear and tear;
(2) Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;
(4) Settling, cracking, shrinking or expansion[.]
The letter advised plaintiff that it could "take this matter up with the New York State Insurance Department[.]" In subsequent correspondence, the parties' respective positions as to which law applied became crystalized.
The contractual basis for plaintiff's claim of coverage is contained in the "Causes of Loss" provisions of the policy, specifically section "D. Additional CoverageCollapse":
We will pay for loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building caused only by one or more of the following:
* * *
2. Hidden decay

*182 * * *
We will not pay for loss or damage to the following types of property, if otherwise covered in this Coverage Part, under items 2., 3., 4., 5. and 6. unless the loss or damage is a direct result of the collapse of a building....
Collapse does not include settling, cracking, shrinking, bulging or expansion.
The question before us, of course, is whether the conditions identified in the inspection of the building satisfy the terms of the policy. The term "collapse" is not defined in the policy itself, so the issue is whether the conditions described constitute "collapse" as a matter of law. There is a division of authority among the states in that regard.
Some courts have held that "collapse" is an unambiguous term "which denotes a falling in, loss of shape, or reduction to flattened form or rubble". [Annotation, What Constitutes "Collapse" of a Building Within Coverage of Property Insurance Policy, 71 A.L.R.3d 1072, 1097 (1976).] See Williams v. State Farm Fire & Cas. Co., 514 S.W.2d 856 (Mo.Ct. App.1974); Krug v. Millers' Mut. Ins. Assoc., 209 Kan. 111, 495 P.2d 949 (1972); Graffeo v. United States Fidelity & Guar. Co., 20 A.D.2d 643, 246 N.Y.S.2d 258 (1964); Employers Mut. Casualty Co. v. Nelson, 361 S.W.2d 704 (Tex.1962). Under the majority view, however, "the term `collapse' does not require complete destruction or falling in of the building...." Indiana Ins. Co. v. Liaskos, 297 Ill.App.3d 569, 231 Ill.Dec. 844, 697 N.E.2d 398, 404 (1998), rehearing denied. Thus, "the clear modern trend is to hold that collapse coverage provisions ... which define collapse as not including cracking and settlingprovide coverage if there is substantial impairment of the structural integrity of the building or any part of a building". American Concept Ins. Co. v. Jones, 935 F.Supp. 1220, 1226 (D.Utah 1996). See also Island Breakers v. Highlands Underwriters Ins. Co., 665 So.2d 1084 (Fla.Dist.Ct.App.1995); Thomasson v. Grain Dealers Mut. Ins. Co., 103 N.C.App. 475, 405 S.E.2d 808 (1991); Beach v. Middlesex Mut. Assurance Co., 205 Conn. 246, 532 A.2d 1297 (1987); Ercolani v. Excelsior Ins. Co., 830 F.2d 31 (3rd Cir.1987); Nationwide Mut. Fire Ins. Co. v. Tomlin, 181 Ga.App. 413, 352 S.E.2d 612 (1986); Sherman v. Safeco Ins. Co., 716 P.2d 475 (Colo.Ct.App.1986); United Nuclear Corp. v. Allendale Mut. Ins. Co., 103 N.M. 480, 709 P.2d 649 (1985); Government Employees Ins. Co. v. DeJames, 256 Md. 717, 261 A.2d 747 (1970). In reaching their decisions, many courts have held that "collapse" is an ambiguous term. See DeJames, [supra,] 261 A.2d at 751-52 (holding that collapse is ambiguous because the word has a more restrictive meaning when used as a verb as when used as a noun).
In American Concept Ins. Co. v. Jones, 935 F.Supp. 1220 (D.Utah 1996), the Court summarized several policies underlying the majority view: (1) if the insurer had intended to define collapse as meaning reduced to a flattened form or rubble, it could have done so in the contract; (2) although the policy stated that collapse did not include settling, cracking, shrinking, bulging or expansion, it was difficult to imagine a collapse that would not include some of these attributes; thus, the term could be interpreted as not including mere settling or cracking, but that which results in "substantial impairment of the home's structural integrity"; (3) some dictionary definitions of "collapse" suggest that the term means a substantial impairment of the structure's integrity; (4) to require a building to fall down before allowing coverage would be unreasonable in light of the insured's duty to mitigate damages and would be economically unsound. Id. at 1227-1228.
This analysis is persuasive.... [T]he modern trend favors a more expansive *183 approach [than previously adopted]. In light of the compelling policy reasons underlying the majority view, we will follow the majority's rationale in this case....
[Rankin v. Generali-U.S. Branch, 986 S.W.2d 237, 238-39 (Tenn.Ct.App.1998), appeal denied (1999).]
The positions of additional states on this divisive question are revealed in annotations and their update supplements. See, e.g., Annotation, What Constitutes "Collapse" of a Building Within Coverage of Property Insurance Policy, 71 A.L.R.3d 1072 (1976); Jane Massy Draper, Annotation, Coverage Under All-Risk Insurance, 30 A.L.R.5th 170, 304-310 (1995).
We agree with the analysis in Ercolani v. Excelsior Insurance Company, 830 F.2d 31, 34-35 (3d Cir.1987), on the basis postulated therein, that New Jersey adheres to the majority view. Under our law, the collapse peril insured against does not require that structures fall; rather, without any narrowing internal definition, such a policy must be taken to cover any serious impairment of structural integrity that connotes imminent collapse threatening the preservation of the building as a structure or the health and safety of occupants and passers-by. Cf. Bromfeld v. Harleysville Ins. Cos., 298 N.J.Super. 62, 688 A.2d 1114 (App.Div.1997); Ariston Airline & Catering Supply Co. v. Forbes, 211 N.J.Super. 472, 511 A.2d 1278 (Law Div.1986).
New York's position on this issue is less easily isolated. To complicate matters further, a preliminary question arises concerning the proper role and function of the forum judge in determining the law of another state. We see no reason why a different rule ought to govern state court judges in determining the law of a sister state than governs federal judges in identifying the law of any state, i.e., to look at the opinions of the state's highest court and, if it has not addressed the question, to predict how, in the light of developing law both within and without the state to date, it would decide. Gares v. Willingboro, 90 F.3d 720, 725 (3rd Cir.1996) (stating that a federal court is bound by the decisions of the state's highest court and that in the event that court has not ruled on the issue the federal court is bound by the state's intermediate appellate courts unless it "is convinced that the state's highest court would decide otherwise"); McKenna v. Pacific Rail Serv., 32 F.3d 820, 825 (3rd Cir.1994) (noting that it is to look first for rulings by the highest court and then to the intermediate appellate courts).
The New York Court of Appeals has not determined the meaning of "collapse" as a matter of law. In deciding that New York law barred the coverage sought here, the motion judge relied upon two Appellate Division cases decided some years ago. In Weiss v. Home Ins. Co., 9 A.D. 2d 598, 189 N.Y.S.2d 355, 357 (1959), the court concluded that the term collapse "involves an element of suddenness, a falling in, and total or near total destruction." In Graffeo v. United States Fidelity & Guar. Co., 20 A.D.2d 643, 246 N.Y.S.2d 258, 260, motion for leave to appeal dismissed, 14 N.Y.2d 685, 249 N.Y.S.2d 882, 198 N.E.2d 911 (1964), the court held that the settling of a concrete slab under a split-level home so that the interior walls pulled away from the ceilings was not a "collapse" within the intendment of the insurance policy.
There is reason to understand, however, that, since Weiss and Graffeo were decided, New York has moved away from its past adherence to what is now the minority view[*] that an actual fallingin or near total destruction must occur before a condition may be found to be a "collapse" under the provisions of an insurance policy which does not define the term. In Bailey v. Hartford Fire Ins. Co., 565 F.2d 826 (2d *184 Cir.1977), the court thoroughly reviewed the then existing state of New York law regarding interpretation of the term "collapse", noting that "it is at once apparent... that there is a clear division in the courts of New York in dealing with the word `collapse.' By any conspectus, the law of New York is unsettled on the point." Id. at 830. The court determined that, despite the uncertainty that prevailed among the intermediate courts in New York, the cases generally adhered to the concept that "collapse", in the context of homeowner's coverage, means a sudden impact that is destructive of the structural integrity of the insured building. Ibid. The court then explained that the expression "collapse" is a "coat of varied colors" and "what constitutes a collapse is largely [a question] of degree." Ibid. The Second Circuit Court of Appeals concluded that there was nothing in the law of New York that "require[d] the insured property be demolished nor reduced to rubble" in order to determine that "collapse" has occurred. Ibid. The court held that the lower federal court's grant of summary judgment based on the minority view of the term "collapse" was error. Id. at 831.
Viewed through the lens provided by the Second Circuit Court of Appeals in Bailey and subsequent state court cases which we will discuss below, we are constrained to conclude that the current law of New York on the issue is unsettled. We are likewise guided by the federal court's prediction that New York's highest court, whenever it is confronted with the question, will adopt the majority view, which does not require a sudden and total (or nearly so) destruction of the insured property in order to conclude that a "collapse" has occurred. Ibid.
Where a sister state's court of last resort has not had occasion to address a question, dated holdings of lower courts provide imperfect guidance in determining the current law of that state, especially when they are at variance with present-day prevailing trends and innocent of the intervening history informing those trends. We have no right to assume that the decisional law of a sister state will remain immutable. It seems obvious that a court in any jurisdiction, which thirty-five and more years ago adhered to what is now the minority view, might well as a matter of judicial policy today, allocate the economic risks of building deterioration in old cities differently.
Cases decided since Bailey support the correctness of the Second Circuit's view of New York law. For example, in Barash v. Insurance Co. of North America, 114 Misc.2d 325, 451 N.Y.S.2d 603, 605 (Sup.Ct.1982), a trial court held as we have in New Jersey, see Kievit v. Loyal Protective Life Ins. Co., 34 N.J. 475, 482, 170 A.2d 22 (1961), that if a term is capable of more than one meaning, the doubt must be resolved in favor of the insured. In Barash, the foundation had settled below a home, leaving a void into which part of the foundation of the house fell. The court held that this occurrence was properly characterized as a collapse of the foundation. Barash, supra, 451 N.Y.S.2d at 605. The court observed: "[i]t is not necessary that the house fall down in a heap before the insured can recover." Id. at 606. The Barash court distinguished its holding from Graffeo in that the policy exclusion in question, regarding settling "in foundations", did not use the term "collapse." Ibid.
An even more recent appellate court opinion in Royal Indem. Co. v. Grunberg, 155 A.D.2d 187, 553 N.Y.S.2d 527 (1990), relied, in part, on the Second Circuit's holding in Bailey to reach a comparable conclusion. In Grunberg, homeowners sought reimbursement from their insurance company for repairs made to their home which were necessary to prevent its inevitable collapse. The court stated that whether a collapse has occurred as a matter of law rested largely on the degree of damage, and it viewed with favor the majority approach that a substantial impairment of the structural integrity of a building *185 constitutes a collapse. Id. at 529. Because the insurer had not "unequivocally established" that the insureds' home did not suffer such an impairment, the court held that the trial court's grant of summary judgment had been inappropriate. Ibid. The court stressed that the "uncontradicted record evidence is that the house was in imminent danger of caving in. [The insurer's] own expert appraiser opined that `if [defendants] failed to make any attempts to save [their] property, the building would ultimately have collapsed, for which coverage would have been afforded under the policy'." Ibid. Noting that the insureds were obligated pursuant to the policy to maintain and repair all covered property in the event of any loss, covered or not, the court determined that the insureds were not to be deprived of reimbursement for the money spent to prevent the actual collapse of their home. Ibid. The court opined that "a construction of the policy faulting them for doing so and triggering coverage only in the event their property was actually demolished or reduced to rubble would be unreasonable, to say the least." Ibid. Aside from the contested issue of material fact regarding "collapse", the court also saw as genuinely disputed whether the impending collapse was sudden or the product of slow deterioration. Ibid. The 1959 Weiss case was cited as authority in this latter regard. Graffeo, from 1964, was not cited at all.
We recognize that all the New York cases we have considered involved homeowner's insurance policies and that the policy in this case is one of commercial insurance. Even though different rules of construction may sometimes apply in commercial insurance situations than govern the rights of homeowners against their insurance carriers, see, e.g., Werner Industries, Inc. v. First State Ins. Co., 112 N.J. 30, 38-39, 548 A.2d 188 (1988); cf. Freedom Cashier, Inc. v. Federal Ins. Co., 262 A.D.2d 353, 693 N.Y.S.2d 604, 605 (1999), we can discern no reason why the law should attribute different meanings to the same term in the two situations.
As a result of our survey, and relying on the Second Circuit's prediction in Bailey, as well as the views expressed in subsequent state court cases, we conclude that New York would today apply the majority rule in determining whether the imminent collapse of plaintiff's building is covered by the insurance policy at issue, and declare in favor of coverage as to that aspect of the dispute between the parties. As we have noted, this is the rule in New Jersey, as well. Without a difference in the law of the two jurisdictions governing the "collapse" issue, there is no need, in that regard, to apply the choice of law principles we have outlined. See Pfizer, supra, 154 N.J. at 199, 712 A.2d 634; Sedler, supra, at 783.
Viewing the facts in the light most favorable to plaintiff, the non-moving party, see Brill v. Guardian Life Ins. Co., 142 N.J. 520, 540, 666 A.2d 146 (1995); Judson v. Peoples Bank & Trust Co., 17 N.J. 67, 74-75, 110 A.2d 24 (1954), both inspectors in the matter determined that the building was in imminent danger of collapse and should be immediately repaired in order to prevent an actual fall. Thus, summary judgment in favor of defendant could not correctly be granted. There may or may not be a genuine issue of material fact whether the structural integrity of the building was in such a state as to be considered "collapsed" under the applicable rule of law, and pursuant to the terms of the insurance policy. Also, defendant asserts that, even if the majority interpretation of "collapse" is applied in this case, the defects to the building were not caused by "hidden decay" and were engendered instead by plaintiff's failure to repair the building; and that, therefore, summary judgment is appropriate. At best, even viewed most favorably for defendant, this argument raises genuine issues of material fact, precluding summary judgment. As held in David Danzeisen Realty Corp. v. Continental Ins. Co., 170 A.D.2d 432, 565 *186 N.Y.S.2d 223, 224 (1991), mere negligence in failing to make proper repairs is not a defense to coverage in New York under an "all risk" policy, which is seen to cover a fortuitous event, defined as "any occurrence or failure to occur which is ... beyond the control of either party". Ibid. (quoting New York Insurance Law § 1101(a)(2) (McKinney 2000)).
Further, plaintiff's building was inspected in February 1992, and none of the problems leading to the imminent collapse of the building were noted at that time. Four years later, plaintiff once again requested an inspector to evaluate the structural integrity of the building. That inspector found the building to be in danger of immediate collapse due to rusting and expansion of internal members, which, among other problems, caused the facade of the building to pull away from its structural supports. That evaluation may be seen to characterize the defects as being hidden. At the very least, there seems to be a genuine issue of material fact as to whether the damage to the building was latent or patent.
To the extent questions of law are involved in respect of any remaining issues, and either party asserts a conflict of laws, see Safer v. Estate of Pack (I), 291 N.J.Super. 619, 629, 677 A.2d 1188 (App.Div.) (noting that "if no issues of conflict of laws or the need to apply foreign law are raised, New Jersey law will continue to govern"), certif. denied, 146 N.J. 568, 683 A.2d 1163 (1996); Graulich Caterer, Inc. v. Hans Holterbosch, Inc., 101 N.J.Super. 61, 67, 243 A.2d 253 (App.Div.1968), and there is a difference in any prevailing rule between the two states, New York law will apply for the reasons we have posited unless special considerations suggest otherwise in respect of any particular issue. See State Farm, supra, 84 N.J. at 34-37, 417 A.2d 488.
To summarize, we have concluded that the trial court was correct to rule that the law of New York governs the substantive issues between the parties to the extent there is a difference between the rules of law prevailing in New Jersey and New York governing the issues it addressed. We have also concluded, in respect of the issue pertaining to "collapse," that the trial court was incorrect in identifying the applicable rule in New York as being different from the prevailing rule in New Jersey, and as precluding coverage on that question. Because those were the only issues argued by the parties and addressed by the trial court in the cross-motions, we will not rule upon any others that remain. See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973) ("It is a well-settled principle that our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available `unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.'"); DeVane v. DeVane, 280 N.J.Super. 488, 490 n. 2, 655 A.2d 970 (App.Div.1995) (considering issues not briefed on appeal to be abandoned); Pressler, Current N.J. Court Rules, comment on R. 2:6-2 (2000) ("[A]n issue not briefed is deemed waived" on appeal.). On remand, the trial court will apply New York law to all additional substantive issues in respect of which either party asserts a conflict of laws and where that State's rule is different from the law of New Jersey, unless it becomes evident that, as to any particular issue, application of the "most significant relationship test" dictates that New Jersey law should apply. See State Farm, supra, 84 N.J. at 34-37, 417 A.2d 488.
The order granting defendant's motion for summary judgment is reversed and the matter is remanded.
NOTES
[*] The Court which decided Graffeo understood it was applying the majority rule at that time. See Graffeo, supra, 246 N.Y.S.2d at 260.