MAHL, J.F., Associate Judge.
Kings Ridge Community Association, Inc. (“the Association”), appeals a final summary judgment in favor of its insurer, Sagamore Insurance Company. The trial court concluded that the Association’s damaged clubhouse was not in a state of “collapse,” as that term is defined by the insurance policy issued by Sagamore, and thus the loss was not covered. We respectfully disagree and accordingly reverse the final judgment.
The Association owns and maintains the common areas, including the clubhouse, of a Lake County community known as “Kings Ridge.” On the morning of February 24, 2010, the exterior doors of the west wing of the clubhouse began to shake and the drop ceiling and soffits deflected downward. The flat roof above the deflected ceiling revealed a substantial depression adjacent to the westernmost HVAC unit. The drop ceiling in the northwest corner of the west wing of the clubhouse structure was significantly deflected downward. The first eleven roof trusses adjacent to the west face mansard roof section had deflected approximately twelve inches at midspan.[1]
The clubhouse was insured under an all-risks business owner’s policy issued by Sagamore. The policy provides that the insurer will pay for direct physical loss of, or damage to, the subject premises caused by or resulting from any “Covered Cause of Loss.” A “covered cause of loss” includes:
5.d. Collapse
(1) With respect to buildings:
(a) Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that *76 the building or part of the building cannot be occupied for its intended purpose;
(b) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse;
(c) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building;
(d) A building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.
(2)We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building that is insured under this policy, if the collapse is caused by one or more of the following:
[[Image here]]
(d) Weight of people or personal property;
(e) Weight of rain that collects on a roof;
(f) Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation. However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in Paragraphs (a) through (e), we will pay for the loss or damage even if use of defective material or methods in construction, remodeling or renovation, contributes to the collapse.
The policy also provided for the following exclusion:
B.2. We will not pay for loss or damage caused by or resulting from any of the following:
[[Image here]]
i. Collapse
Collapse, except as provided in the Additional Coverage for Collapse. But if collapse results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.
[[Image here]]
3. We will not pay for loss or damage caused by or resulting from any of the following Paragraphs a. through c. But if an excluded cause of loss that is listed in Paragraphs a. through c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.
[[Image here]]
c. Negligent Work
Faulty, inadequate or defective:
(1) Planning, zoning, development, surveying, siting;
(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
(3) Materials used in repair, construction, renovation or remodeling; or
(4) Maintenance;
of part or all of any property on or off the described premises.
Following the event, each party hired expert engineers to inspect the property, investigate the cause of the damage, and issue reports. The parties agree that the findings and conclusions of both parties’ engineers are virtually identical. The engineers found that the first eleven roof trusses in the western area of the west wing of the clubhouse failed, deflecting approximately twelve inches at midspan. As a result, the roof above the trusses depressed twelve inches and the ceiling *77 below the trusses deflected twelve inches as well.
Both engineers noted that the top chord of the original trusses in the clubhouse west wing had been field-modified at the time of the building’s construction. They also noted that the original air-conditioning units on top of the building had been replaced by units that weighed more than the original units and that rainwater would regularly pond on the roof. The engineers concluded that the combined factors of the cut top chord, the heavier HVAC unit, and the ponding rainwater all contributed to the failure of one or several of the eleven consecutive roof trusses, which resulted in the progressive failure of the remaining eleven trusses on the day of the reported incident. As a result of the damage to the roof, drop ceiling, and roof trusses, it was the opinion of the engineers that the structure represents a dangerous and unsafe structural condition.
After the Association submitted a claim under the policy, Sagamore filed a declaratory judgment action to determine the extent, if any, of its duty to provide coverage for the claimed loss. Relying on the aforementioned paragraphs 5.d.(l)(c) and (d) of the policy, the trial court concluded that the clubhouse was not in a state of collapse within the terms of the policy and granted Sagamore’s motion for summary judgment.
We review the entry of a summary judgment de novo. Volusia Cnty. v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126,130 (Fla.2000). Summary judgment is proper if there is no genuine issue of material fact and if the moving party is entitled to a judgment as a matter of law. Id. We also review the legal interpretation of contractual terms de novo. Lowe v. Winter Park Condo. Ltd. P’ship, 66 So.3d 1019, 1020 (Fla. 5th DCA 2011).
In interpreting an insurance contract, the courts are bound by the plain meaning of the contract’s text. State Farm Mut. Auto. Ins. Co. v. Menendez, 70 So.3d 566, 569-70 (Fla.2011). If the language is plain and unambiguous, the courts must give effect to the policy as it was written. However, if the language is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage, then the policy is ambiguous. When language in an insurance policy is ambiguous, a court will resolve the ambiguity in favor of the insured by adopting the reasonable interpretation of the policy’s language that provides coverage as opposed to the reasonable interpretation that would limit coverage.
Sagamore argues that the policy does not cover the claimed loss because the roof has not “fallen” and the building is still standing. The photographs and engineering reports show that the roof of the clubhouse has not fallen to the ground. Nevertheless, the loss appears to meet the requirements in section 5d.(l) for a “collapse.” The policy defines “collapse” as an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose. “Abrupt” is defined as “characterized by or involving action or change without preparation or warning: unexpected.” Merriam-Webster’s Collegiate Dictionary 4 (11th ed. 2008).
The record establishes that on February 24, 2010, there was an unexpected change to the clubhouse when the exterior doors of the west wing of the clubhouse began to shake and the drop ceiling and soffits deflected downward, the flat roof above the deflected ceiling substantially depressed, and the first eleven roof trusses adjacent to the west wing of the clubhouse structure deflected twelve inches at midspan.
*78 The drop ceiling, flat roof, and trusses are all parts[2] of the building. When the trusses failed, the roof above the trusses and the drop ceiling below the trusses deflected downward twelve inches meeting not only the definition of “falling down,”[3] but the definition of “caving in,”[4] as well. At the time of the incident, all of these parts descended freely by the force of gravity, dropped to a lower position, and became lower in degree or level. In addition, all of these building parts suddenly fell down or inward. The policy is not written in terms of how far a part of a building must fall down or to what degree a part of a building must cave in to constitute “collapse.”
Finally, the record establishes that the building is structurally unsafe and cannot be occupied for its intended purpose. Clearly, one cannot occupy a building if it has completely fallen down or caved in. However, the same may be true for a part of a building that has partially fallen down or caved in. The policy does not clearly require total destruction for a “collapse” to occur. To the extent that the policy can be interpreted as requiring the roof to have fallen to the ground for coverage to apply, the policy is ambiguous.
Sagamore argues that the definition for “collapse” under section 5.d.(l)(a) is further clarified by paragraphs 5.d.(l)(b), 5.d.(l)(c) and 5.d.(l)(d). Under 5.d.(l)(b), “[a] building or any part of the building that is in danger of falling down or caving in is not considered to be in a state of collapse.” This section does not apply to the present case as the drop ceiling, flat roof, and trusses have already fallen down and caved in and therefore are not in danger of falling down or caving in. Paragraph 5.d.(l)(c) provides that “[a] part of the building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.” This section does not apply to the facts in this case since there is no claim or evidence that the drop ceiling, flat roof, and trusses separated from another part of the building.
Moreover, “standing” is defined as “upright on the feet or base; remaining at the same level, degree, or amount for an indeterminate period.” Merriain-Webster’s 1216. Prior to the incident of February 24, 2010, the drop ceiling, flat roof, and trusses were upright on their base and had remained at the same level, degree, and amount of height for an indeterminate period. At the time of the incident, they collapsed. Immediately after the incident, they were no longer upright on their base; they were no longer at the same level, degree, or amount of height that they had previously maintained. Therefore, by definition, the drop ceiling, flat roof, and trusses are not standing and this section does not apply.
Since the drop ceiling, flat roof, and trusses by definition are not standing, sec *79 tion 5.d.(l)(d) does not apply even though the roof is showing evidence of bending or sagging. Having found coverage under section 5.d.(l)(a), if we were to accept Sa-gamore’s argument that paragraphs 5.d.(l)(b), 5.d.(l)(c) and 5.d.(l)(d) should be interpreted to avoid coverage, then the policy is ambiguous and any ambiguity in the policy must be resolved in favor of coverage. Menendez, 70 So.3d at 570.
Next, Sagamore argues that if coverage is to be found under the section 5.d. “collapse” provisions of the policy, then the exclusions under paragraph 3, specifically paragraphs 3.c.(2), 3.c.(3) and 3.c.(4) would exclude coverage. However, this argument is not supported by a careful reading of the exclusion section of the policy.
There is no dispute the “Additional Coverage for Collapse,” section 5.d of the policy, applies in this case. Therefore, any analysis of the exclusion section of the policy should begin with paragraph 2 of the exclusion section and more specifically paragraph 2.(i) of the exclusion section. This section excludes “collapse” from coverage, “except as provided in the Additional Coverage for Collapse” section. This indicates that the additional collapse coverage is not modified or qualified by any of the other listed exclusions, including those in paragraph 3, which appear to apply to the general coverage provisions of the policy instead.[5] At best, this provision is ambiguous.
In addition, Sagamore’s argument that paragraphs 3.c.(2), 3.c.(3) and 3.c.(4) would exclude coverage makes little sense because paragraphs 5.d.(2)(d), (e) and (f) of the collapse coverage specifically includes coverage for collapse caused by one or more of the following: weight of people or personal property, weight of rain that collects on a roof, and use of defective material or methods in construction, remodeling, or renovation. This applies even if the collapse occurs, as it did in this case, after completion of the construction, remodeling, or renovation as long as the collapse is caused in part by, among other things, the weight of rain that collects on a roof or the weight of people or personal property. It is undisputed that both engineers agreed that the collapse was caused in part by the weight of the rain that collected on the roof and the weight of the air conditioners.[6] Therefore, the exclusions in paragraphs 3.c.(2), 3.c.(3) and 3.c.(4) would directly contradict and conflict with the coverage provided in the collapse coverage provided in paragraphs 5.d.(2)(d), (e), and (f). This is another ambiguity in the policy.
In reaching our conclusion that the policy is ambiguous, we find instructive the cases cited by the Association as they are factually similar and involve the same policy language as in the present case. See, e.g., Malbco Holdings, LLC v. AMCO Ins. Co., 629 F.Supp.2d 1185 (D.Or.2009) (identical policy language involving truss system that failed causing floor and ceiling to settle by three inches); ISO Slade Condo. Ass’n, Inc. v. Millers Capital Ins. Co., No. CIV.A. CCB-07-1779, 2008 WL 2331048 (D.Md. June 02, 2008) (identical policy language involving support column buckling three inches down and three inches to south causing condominium unit’s ceiling to separate from the wall); Landmark Realty, Inc. v. Great Am. Ins. Co., No. CIV. JKS 10-278, 2010 WL 5055805 (D.Md. Dec. 03, 2010) (identical policy language involving a two-story apartment building *80 where ground floor fell anywhere from one inch at one end of building to seventeen and one-half inches on other end as result of failure of wood support structure underneath the floor).[7]
In sum, we hold that the policy language is susceptible to more than one reasonable interpretation, one providing coverage, and the other limiting coverage. Therefore the policy is ambiguous and this court must resolve the ambiguity in favor of the insured by adopting the reasonable interpretation of the policy’s language that provides coverage as opposed to the reasonable interpretation that would limit coverage. Menendez, 70 So.3d at 570. Accordingly, the final judgment is reversed and the cause is remanded for further proceedings consistent with this opinion.
REVERSED and REMANDED.
SAWAYA and TORPY, JJ., concur.

. The parties agreed on these facts and their experts relied on these facts in reaching their conclusions.

. "Part" is defined as: "(1): one of the often indefinite or unequal subdivisions into which something is or is regarded as divided and which together constitute the whole (2): an essential portion or integral element.” Merriam-Webster's 902-903.

. "Fall" is defined as: "to descend freely by the force of gravity ... to hang freely ... to drop oneself to a lower position ... to become lower in degree or level.” Merriam-Webster's 405.

."Cave” is defined as: “1: to fall in or down especially from being undermined — usually used with in 2: to cease to resist ... usually used with in: to cause to fall or collapse— usually used with in." Merriam-Webster's 197. “Cave-in” is defined as: "to fall down or inward; an occurrence in which something (such as the roof or walls of a building or cave) suddenly falls down or inward.” Merriam-Webster Learner’s Dictionary, http:// www.learnersdictionary.com/-searcli/cave (last visited May 23, 2012).

. It makes no sense to specifically not exclude something in paragraph 2 only to exclude it in paragraph 3.

. It is unclear from the policy whether the air-conditioners would qualify as personal property.

. We find the cases cited by Sagamore, Mt. Zion Baptist Church of Marietta v. GuideOne Elite Ins. Co., 808 F.Supp.2d 1322 (N.D.Ga. 2011), Rapp B. Properties, LLC v. RLI Ins. Co., 65 A.D.3d 923, 885 N.Y.S.2d 283 (N.Y.App. Div.2009), and Miller v. First Liberty Ins. Corp., No. CIV.A. 07-1338, 2008 WL 2468605 (E.D.Pa. June 17, 2008), are inapposite.