**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4137-17T2

PARKO PROPERTIES, LLC,

    Plaintiff-Respondent/
    Cross-Appellant,

v.

MERCER INSURANCE
COMPANY OF NEW JERSEY,

    Defendant-Appellant/
    Cross-Respondent.

_____

Argued November 12, 2019 – Decided November 19, 2020

Before Judges Ostrer and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-1746-14.

Gregory W. Boyle argued the cause for appellant/cross-respondent (Ronan, Tuzzio & Giannone, PA, attorneys; J. Elliott Stolz and Alexander S. Carmichael, on the briefs).

Mara P. Codey argued the cause for respondent/cross-appellant (Mandelbaum Salsburg, PC, attorneys; Mara

P. Codey, of counsel and on the briefs; Charles S. Lorber, on the briefs).

The opinion of the court was delivered by

OSTRER, J.A.D.

This case is an insurance coverage dispute that arose in the aftermath of Superstorm Sandy. Plaintiff Parko Properties LLC (Parko) purchased insurance for its commercial retail building from defendant Mercer Insurance Company. After Sandy, the building sustained damage to the roof and its supporting wooden trusses. Parko submitted a claim to Mercer under the policy's "collapse" coverage. Mercer denied the claim, and affirmed its decision in an internal appeal. The trial court eventually granted Parko's motion to establish coverage, and Mercer then moved to have the damages submitted to appraisal as authorized by the policy. After the appraisers for each party agreed on damages, the trial court memorialized the appraisers' agreement in a consent judgment. Parko then moved to amend the judgment to award it costs, interest, and fees pursuant to Rule 4:58-2, as the consent judgment amount was more than 120 percent of the judgment Parko offered, and Mercer rejected, three years earlier. The trial court denied the motion.

A-4137-17T2

Mercer appeals from the order finding coverage, and Parko cross-appeals from the denial of its motion to amend the judgment, and the dismissal of its bad faith claim.

We agree the damage to the building was a covered loss, although Mercer did not act in bad faith; but Parko should have been granted costs, interest, and fees under the offer-of-judgment rule. Therefore, we affirm in part, reverse in part, and remand for further proceedings.

I.

Parko's building — a shopping center with about 23,000 square feet of leasable area — was inspected multiple times, both before it was insured, and after Sandy.

In 2010, Parko hired an engineer to conduct a pre-purchase inspection. The report noted the inspection "should be representative of all structural items in the building." The inspector noted cracking in the building basement, but opined it did "not indicate a major structural defect." Lastly, it noted, "[s]tructurally speaking, this was a well-built building when it was first constructed and it still can be so described." The report recommended replacing the portion of the roof over the "smaller stores." The record indicates the location of the damage post-Sandy was over the larger store, Family Dollar.

In 2011, before providing insurance, Mercer also inspected the building. The "property report" noted the roof condition as "good," and the building structure as being in "good condition." The report recommended minor repairs, such as installing a handrail, filling in potholes, and installing a smoke detector in one store, but the report recommended no structural work.

Sandy came ashore in New Jersey the evening of October 29, 2012.[1] One or two days afterward, Dr. John Park, the managing member of Parko, visited the building and observed debris on the ground, power outages, broken windows, and tree branches down. Of the seven tenants inside the building, one notified Park of roof damage. Park hired Titan Engineering to inspect the property in mid-November, and the firm found "major truss damage" that required immediate attention. Titan informed Park that four of the seven trusses in the roof were broken; the roof was sagging; and cracks formed on the exterior of the building. Titan opined "that the damage to the building's roof trusses

---

[1] Although Sandy "transitioned into a post-tropical cyclone just prior to making landfall" in New Jersey, see https://www.weather.gov/okx/Hurricane Sandy5Year (last visited October 19, 2020), its wind gusts in New Jersey reached hurricane strength thereafter; storm surges and flooding accompanied the storm; and it caused exceptional damage, especially along the New Jersey Shore, see Eric S. Blake, et al., Tropical Cyclone Report Hurricane Sandy, 22-29 October 2012, (Nat'l Hurricane Center, Feb. 12, 2013). Sandy ranks second only to Hurricane Katrina in total damage. Id. at 15.

A-4137-17T2

w[as] a direct result of the high winds associated with Hurricane Sandy." Titan stated that the damage to the trusses "cannot be attributed to a singular defect or observable apparent wear-tear of the trusses." Titan noted that the 2010 inspection noted no damage to the roof or trusses.

Temporary shoring was initially put in place to prevent further damage. Parko then hired Dajon Associates, a contractor, to repair the trusses, which was completed in October 2013. The barrel roof was also replaced. However, as a result of the roof damage, the tenant had to evacuate the space during repairs.

After the storm, an adjuster and an engineer for Mercer also inspected the damage, and both opined it was similar to other damage they had seen as a result of high winds from Sandy. Mercer's adjuster took photos of the damaged roof, noting that it had "caved in."

However, a few months later, the engineer issued a report stating the damage resulted from other causes. Mercer then denied Parko's claim for coverage, stating that its engineer found "the bowstring roof trusses were damaged as a consequence of their original design and decades of cyclical roof loading," and that "[t]here was evidence of initial cracks and splits in the wood members of the truss that occurred prior to Hurricane Sandy." Mercer's denial

also cited a "lack of proper building maintenance," and wear and tear over the life of the building.

Mercer's engineer maintained that the wind from Sandy did not cause the roof or trusses to fail, and the wind would have lifted the roof, not pushed it down. The engineer also noted that "metal joist hangers" had been installed to address problems with the trusses before Sandy hit.

Parko's engineer responded that there was no evidence the truss Mercer's engineer evaluated cracked before the storm. He highlighted there were no reported problems with the roof before the storm, but significant problems afterwards.

Parko asked Mercer to reconsider its denial. Mercer declined, citing the policy's collapse and wear and tear provisions. Mercer also denied Parko's internal appeal for the same reasons.

Parko then filed suit against Mercer, alleging bad faith denial of its claim, and breach of contract. Parko requested a declaratory judgment in favor of coverage. The parties engaged in extensive discovery and pre-trial motion practice.

Eventually, the court granted Mercer's motion for partial summary judgment, and dismissed Parko's bad faith claim. The trial court applied the

"fairly debatable" standard our Supreme Court adopted in Pickett v. Lloyd's, 131 N.J. 457, 461 (1993), and found that as there were dueling expert reports issued before Mercer denied the claim, it was fairly debatable whether there was indeed coverage.

Shortly before trial, the court granted Parko's motion to establish that its loss fell within the policy's coverage for losses caused by collapse of the building or a structural part of the building. The court had barred Mercer from presenting evidence of the condition of the roof before it issued its policy in 2011, and concluded there was insufficient evidence to establish that wear and tear thereafter caused the loss.[2] The trial court then granted Mercer's motion that, as coverage had been found, damages would be decided by way of appraisal. The appraisers ultimately agreed that Parko suffered $497,000 in damages. The trial court memorialized the appraiser's determination in a judgment, with counsels' consent. Parko then moved to amend the judgment to award it litigation costs, interest and attorney's fees pursuant to the offer-of-

---

[2] Although Parko brought its motion for coverage in the form of a motion in limine, its counsel conceded at the hearing that its motion was "in the nature of a summary judgment motion." Since the motion concerned the "suppression of [Mercer's] defenses," Seoung Ouk Cho v. Trinitas Reg'l Med. Ctr., 443 N.J. Super. 461, 471 (App. Div. 2015), we view it as a motion for partial summary judgment.

A-4137-17T2

judgment rule, based on its offer to accept a judgment of $400,000, which Mercer rejected three years earlier. The court denied the motion, citing <u>Serico v. Rothberg</u>, 234 N.J. 168 (2018).

Mercer appeals from the court's determination of coverage. Parko cross-appeals from the dismissal of its bad faith claim, and the denial of costs, interest and fees under the offer-of-judgment rule.

II.

A.

This appeal principally concerns interpretation of an insurance contract, which is a question of law that we review de novo. <u>See</u> <u>Pickett ex rel. Estate of Pickett v. Moore's Lounge</u>, 464 N.J. Super. 549, 554-55 (App. Div. 2020) (citing <u>Abboud v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.</u>, 450 N.J. Super. 400, 406 (App. Div. 2017)); <u>see also</u> <u>Kieffer v. Best Buy</u>, 205 N.J. 213, 222 (2011).

In interpreting an insurance policy, "[w]e are guided by general principles: 'coverage provisions are to be read broadly, exclusions are to be read narrowly, potential ambiguities must be resolved in favor of the insured, and the policy is to be read in a manner that fulfills the insured's reasonable expectations.'" <u>Sosa v. Mass. Bay Ins. Co.</u>, 458 N.J. Super. 639, 646 (App. Div. 2019) (quoting <u>Selective Ins. Co. of Am. v. Hudson E. Pain Mgmt. Osteopathic Med.</u>, 210 N.J.

8

597, 605 (2012)).  We turn first to the policy language, and apply its "plain, ordinary meaning." Zacarias v. Allstate Ins. Co., 168 N.J. 590, 595 (2001).  We liberally construe the policy in the insured's favor "'to the end that coverage is afforded to the full extent that any fair interpretation will allow.'" Progressive Cas. Ins. Co. v. Hurley, 166 N.J. 260, 273 (2001) (internal quotation marks omitted) (quoting Kievit v. Loyal Protective Life Ins. Co., 34 N.J. 475, 482 (1961)).  "In determining whether there is ambiguity, we consider whether an average policyholder could reasonably understand the scope of coverage, and whether better drafting could put the issue beyond debate." Sosa, 458 N.J. Super. at 646.

The policy "cover[s] the *collapse* of a building or any structural part of a building," but only if the event satisfies the definition of what a "collapse" is and what it is not; and only if the "collapse" results from certain identified causes and not others.  The parties dispute whether the damage to Parko's building was a "collapse" as defined, and whether it resulted from a covered cause.  We address the issues in turn.

B.

The policy glossary defines "collapse" as the "abrupt falling down or caving in of a building or structural parts of a building."  Thus, "collapse"

includes three elements: the event must be "abrupt"; it must consist of a "falling down or caving in"; and it must pertain to the building as a whole or a "structural part."

The policy also narrows the definition three ways. The policy excludes a collapse that may be imminent, but has not yet occurred, by stating that "collapse" does not include a building or a building part that is "[i]n danger of falling down or caving in." The policy also states that "collapse" does not include a building or building part that is "[s]tanding, even if it has separated from another part of the building." Furthermore, "collapse" does not include "bulging, cracking, expanding, settling or shrinking."

Although the policy does not define "structural part," Mercer does not dispute that the trusses and roof were structural parts. Mercer denies they fell down or caved in, or they did so abruptly. Mercer contends the building or structural part must drop to the ground and do so "within a matter of seconds." Mercer also contends the building and trusses were "entirely still standing" after Parko reported its loss, because they were not flat on the ground.

Mercer's interpretation is a plausible one. But, so is an alternative interpretation that encompasses what happened to Parko's building; and, as noted above, we resolve ambiguity in the insured's favor.

A-4137-17T2

We consider the meaning of "caving in."[3]  "[I]n common parlance, a building can cave in . . . with the result that the building . . . cannot be occupied for its intended purpose . . . by having its roof or ceiling fall an appreciable distance."  Hoban v. Nova Cas. Co., 335 F. Supp. 3d 1192, 1202 (E.D. Cal. 2018) (internal quotation marks and citation omitted) (applying California law).  Particularly since the policy covers structural parts, as well as the building as a whole, one may reasonably interpret the policy to cover a partial collapse or caving in.  See Id.  at 1203.

In Hoban, the court found coverage under a policy form strikingly similar to Mercer's.  Two roof trusses failed, causing the ceiling to drop six to ten inches.

---

[3] We are mindful that Mercer's policy form is more restrictive than the form we analyzed in Fantis Foods, Inc. v. N. River Ins. Co., 332 N.J. Super. 250 (App. Div. 2000).  That policy covered loss or damage from "collapse of a building or any part of a building."  Id. at 258.  Discerning ambiguity, we held that an imminent collapse was covered.  Id. at 260 (interpreting policy "to cover any serious impairment of structural integrity that connotes imminent collapse threatening the preservation of the building as a structure or the health and safety of occupants").  Unlike the North River form, the Mercer form expressly excludes "a building or part of a building that is . . . [i]n danger of falling down or caving in" or is "[s]tanding, even if it has separated from another part of the building."  However, as one commentator has observed, insurers' efforts to "correct the ambiguity identified by the court in Fantis Foods" have not always succeeded, as "[c]ourts have . . . been reluctant to read the revisions as insurers would like."  5 Joseph D. Jean and Gregory D. Miller, New Appleman on Insurance Law Library Edition, § 53.03[9][a] (2020).

A-4137-17T2

Id. at 1196. The local building inspector closed the building for repairs because it was unsafe. Confronted with an insurer's interpretation of "falling down or caving in" much like Mercer's, the court concluded the language was ambiguous and resolved that ambiguity in the insured's favor. Id. at 1203-04. Similarly, other courts have found that part of a building collapsed by "caving in" several inches. See Malbco Holdings, LLC v. AMCO Ins. Co., 629 F. Supp. 2d 1185, 1196 (D. Or. 2009) (holding that a part of a building "caved in" where floor trusses under an indoor pool area failed and part of a hotel dropped over three inches, and noting the policy did not say "how far a building must fall down or to what degree a building must cave in to constitute collapse"); Gulino v. Economy Fire & Cas. Co. , 971 N.E. 2d 522, 528 (Ill. App. Ct. 2012) (holding that a basement ceiling that dropped about eight inches "caved in," stating the term "cave in" "connotes the undermining of a structure that can be something less than a complete falling down").

We find these authorities persuasive. Accordingly, Parko's roof caved in. Photographic evidence showed the crown of the barrel roof was depressed and dropped some significant distance. Even Mercer's own adjuster used the term "caved in" to describe photos of the roof taken after the reported loss.

12

Our conclusion is supported by the definition of "cave in" found in a dictionary, to which we may refer for the meaning of undefined policy terms. See Cypress Point Condo. Ass'n, Inc. v. Adria Towers, L.L.C., 226 N.J. 403, 425-26 (2016) (endorsing dictionary use for common understanding of policy language). "Cave in" means "to cease to resist." Merriam-Webster's Ninth New Collegiate Dictionary 217 (1990). The engineering reports agreed the trusses had failed; therefore, they had "cease[d] to resist" the roof they were intended to support. If the trusses were merely "in danger" of ceasing to resist, the building would not have needed immediate, emergency shoring.

Mercer also contends there is nothing in the record to indicate any collapse was "abrupt." However, the record is clear there were no complaints of any structural defects in the trusses, roof, and support system before Sandy hit. The pre-purchase and pre-insurance inspections did not reveal any structural defects. Upon returning to work one or two days after Sandy, Family Dollar Store employees immediately complained of new issues with the roof, and upon inspection, the roof needed emergency shoring, as four of the seven trusses had completely failed. Photographs depicted a pronounced depression in the roof that did not exist before Sandy.

A-4137-17T2

We reject Mercer's contention that an "abrupt" collapse must occur "within a matter of seconds." The policy does not say that, and a reasonable interpretation would encompass an event that occurred in the time it took for a major storm to pass through the state. Interpreting a pollution coverage for an "abrupt" release, one federal court rejected the insurer's argument that a release over a span of several hours was "insufficiently 'abrupt'." Coffeyville Res. Ref. & Mktg., LLC v. Liberty Surplus Ins. Corp., 714 F. Supp. 2d 1119, 1153 (D. Kan. 2010). Another court, interpreting collapse coverage for an abrupt falling down or caving in, held that "abrupt" means "characterized by or involving action or change without preparation or warning." Hurlburt v. Mass. Homeland Ins. Co., 310 F. Supp. 3d 333, 341 (D. Conn. 2018). We construe the "abrupt" requirement to exclude a collapse that occurred gradually over an extended period of time. See 10A Steven Plitt et al., Couch on Insurance § 148:54 (3d ed. 2020) (distinguishing "a gradual occurrence over a period of time" with collapse as a "sudden or relatively abrupt occurrence causing serious structural damage"). The collapse here occurred not gradually, but abruptly as a result of a passing superstorm.

Turning to the three exclusions in the definition, we acknowledge that absent emergency shoring, Parko's building was in danger of extreme damage,

14

if not collapse to the ground. But, that is not a basis to deny coverage, because a partial collapse had already occurred, as it had in Hoban, Malbco, and Gurino.

We also conclude that under a plausible reading of the policy, the trusses and roof were not "standing" after the storm. When considering a coverage dispute, a Florida court turned to a dictionary definition to define "standing" as "upright on the feet or base; remaining at the same level, degree, or amount for an indeterminate period." See Kings Ridge Cmty. Ass'n, Inc. v. Sagamore Ins. Co., 98 So. 3d 74, 78 (Fla. Dist. Ct. App. 2012) (quoting Merriam-Webster's Collegiate Dictionary 1216 (11th ed. 2008)). Applying that definition to a substantially similar "collapse" policy, the court found a drop ceiling, roof, and trusses were no longer "standing," because "they were no longer upright on their base; they were no longer at the same level, degree, or amount of height that they had previously maintained." Kings Ridge, 98 So. 3d at 78. See also DENC, LLC v. Philadelphia Indem. Ins. Co., 421 F. Supp. 3d 224, 235 (M.D.N.C. 2019) (interpreting North Carolina law to find collapse coverage, holding that a breezeway had collapsed and was not "standing" where it had fallen one foot and part was resting on the ground below).

Finally, the collapse definition's exclusion of "bulging, cracking, expanding, settling or shrinking" does not take Parko's claim outside the

coverage. In <u>Fantis Foods</u>, we quoted with approval the statement that "it was difficult to imagine a collapse that would not include some of these attributes; thus, the term could be interpreted as not including mere settling or cracking, but that which results in 'substantial impairment of the home's structural integrity.'" 332 N.J. Super. at 259-60 (quoting <u>Rankin ex rel. Rankin v. Generali-U.S. Branch</u>, 986 S.W.2d 237, 238-39 (Tenn. Ct. App. 1998) (quoting <u>Am. Concept Ins. Co. v. Jones</u>, 935 F. Supp. 1220 (D. Utah 1996)). Put another way, if we adopted Mercer's interpretation of "bulging, cracking, expanding, settling or shrinking," then coverage for collapse would be illusory, since any building that falls to the ground in a pile of rubble will necessarily have bulged, cracked, expanded, settled or shrunk in the process of collapsing. We shall not "construe . . . exclusions in a manner that makes promises in the coverage section illusory." <u>Customized Distribution Servs. v. Zurich Ins. Co.</u>, 373 N.J. Super. 480, 493 (App. Div. 2004).

In sum, we conclude that a collapse occurred, consistent with the policy's definition.

## C.

Even if the damage to Parko's building was a "collapse," Mercer contends it resulted from uncovered causes. We disagree.

16

A covered collapse must "ensue[] only as a consequence of" six identified categories of causes. The first of the six incorporates a list of fifteen other causes, including "Windstorm/Hail" and "Weight of Ice, Sleet, or Snow."[4] The remaining five causes of covered collapse include:

> **2.** Hidden decay, unless such decay is known to an *insured* prior to *collapse*.
>
> **3.** Hidden insect or vermin damage, unless such damage is known to an *insured* prior to *collapse*.
>
> **4.** Weight of contents, equipment, animals, or people.
>
> **5.** Weight of rain that collects on a roof.
>
> **6.** Use of defective material or methods in construction, remodeling, renovation or repair.

Parko contends that, based on its engineer's analysis, the collapse was caused by Superstorm Sandy, which falls within the "Windstorm/Hail" cause. Mercer's expert attributed the truss and roof damage to defective design and

---

[4] The collapse provision refers to "1. Any cause of loss provided for in Coverage B under Basic Plus Coverage." That "Coverage B" insures against "fortuitous direct physical loss by the following, subject to all applicable provisions in this policy" including "Fire (hostile fire); Aircraft; Explosion; Falling Objects; Glass Breakage; Lightning; Riot or Civil Commotion; Sinkhole Collapse; Smoke; Sprinkler Leakage; Vandalism; Vehicles; Volcanic Eruption; Weight of Ice, Sleet or Snow; and Windstorm/Hail." The policy defines most of these terms, but not "Windstorm/Hail" or "Weight of Ice, Sleet or Snow." Elsewhere in the policy, the term "specified causes of loss" is used to encompass those fifteen causes.

materials, and "cyclical roof loading."  Even if one credits Mercer's expert, a covered cause resulted in the collapse.  Defective design and materials fall within covered cause #6.  And, "cyclical roof loading" evidently is just another way to say the weight of ice, sleet and snow and rain over the course of time damaged the roof.  The policy covers collapse from those causes, too.  Mercer also cited "lack of proper building maintenance" as contributing to the collapse. Its expert noted that cracks in the building were caulked, without addressing what the expert claimed was the precipitating cause.  Yet, a collapse from "defective . . . methods in . . . repair" is covered.

Mercer contends that the collapse is not covered because it resulted from excluded causes that contributed concurrently to the collapse.  Mercer relies on a separate part of the policy entitled "Losses Not Insured," which denies coverage if a loss results "directly or indirectly" or "concurrently or otherwise" from one of the causes set forth in fifteen sections.  In particular, Mercer relies on a section entitled "Wear, Tear and Other Specified Causes of Loss Exclusions." Subsection A excludes losses caused by "[w]ear and tear . . . decay or deterioration; deficiency, error, or omission in design, materials, plans, or workmanship."  Subsection B excludes losses caused by "[b]uckling, bulging, contracting, cracking, expansion, settling, shrinkage, or sinking."  The "Wear,

18

Tear" section concludes with an opaque statement: "If loss by a covered *specified cause of loss*" — that is, one of the fifteen causes listed, supra, at note 3 — "ensues *we* insure such resulting loss, other than collapsing concurrent with or ensuing as a result of loss subject to in [sic] the preceding Exclusions B" — that is, buckling, bulging, etc. — "and E" — which includes movement of earth, including landslides.

We need not delve into the meaning of these excluded causes, nor need we examine the scope and enforceability of the so-called anti-concurrent and anti-sequential clauses.[5] We also need not address Parko's argument that, as a result of its pre-insurance inspection that found no structural defects, Mercer is estopped from relying on wear and tear that preceded the policy's effective date. We may avoid these controversies because we conclude that the "Losses Not Insured" part of the policy does not unambiguously limit the collapse coverage provided in the "Supplemental Coverages" part of the policy.

The "Losses Not Insured" part begins with a significant qualification. It states, "*We* do not insure loss consisting of, directly or indirectly, caused by, one

---

[5] See, e.g., Simonetti v. Selective Ins. Co., 372 N.J. Super. 421, 431 (App. Div. 2004); Brindley v. Firemen's Ins. Co. of Newark, N.J., 35 N.J. Super. 1, 6 (App. Div. 1955); see also Assurance Co. of Am., Inc. v. Jay-Mar, Inc., 38 F. Supp. 2d 349, 352-54 (D.N.J. 1999).

or more of the following, <u>except to the extent otherwise specifically provided</u> <u>for in this policy</u> . . . ." (Emphasis added). Reasonably construed, the "except to the extent" clause means that the "Losses Not Insured" provisions do not override the collapse coverage the policy specifically provides in the preceding, "Supplemental Coverages" part of the policy.

Notably, the preamble to the "Supplemental Coverages" part provides, albeit in the form of an exception, that the supplemental coverages override other policy provisions. It states, "These coverages do not extend or modify any provisions of this policy <u>except to the extent specifically described in the</u> <u>following Items 1 through 21</u>," where item 6 provides collapse coverage. (Emphasis added).

At the very least, the competing "except to the extent" clauses in the preambles to the "Supplemental Coverages" and the "Losses Not Insured" parts of the policy create ambiguity. As one treatise observes, "disputes can arise over whether coverage provisions and exclusions in one part of the policy apply to the insurance for collapse in the 'Additional Coverage' section." 5 Michael Raibman and Paul Walker-Bright, <u>New Appleman on Insurance Law Library</u> <u>Edition</u>, § 45.06[3][a] (2020). The ambiguity must be resolved in the insured's favor. "The confusion created by conflicting policy provisions often leads

courts to find an ambiguity that must be resolved in favor of coverage."  Ibid.; see also Id. at §45.06[1] (stating that "[u]nless the collapse coverage provision expressly states that it is subject to exclusions in the main body of the policy, courts generally hold that collapse coverage is not limited by such exclusions").

In addition, Mercer's reading of the policy would render aspects of the collapse coverage illusory.  For example, the policy provides collapse coverage if caused by "[u]se of defective material or methods in construction," yet the "Losses Not Insured" part excludes losses caused by "deficiency, error, or omission in design, materials, plans or workmanship."  The collapse coverage encompasses collapse caused by hidden decay, yet the "Losses Not Insured" part excludes losses caused by decay, hidden or not.  As noted, we will not interpret a policy to render provisions illusory.

In sum, we conclude that Parko was entitled to coverage as structural parts of the building caved in, as a result of causes identified in the collapse coverage.

## III.

Parko cross-appeals from the trial court's summary judgment dismissal of its bad faith claim against Mercer.  We affirm.

"[A]n insurance company owes a duty of good faith to its insured in processing a first-party claim."  Pickett v. Lloyd's, 131 N.J. 457, 467 (1993).

This case involves a "first-party" claim, as it is brought by the insured against its own insurance company. Id. at 466. To establish an insurer's bad faith, the insured must demonstrate that coverage was so clear it was not "fairly debatable." Id. at 473 (quoting Bibeault v. Hanover Ins. Co., 417 A.2d 313, 319 (R.I. 1980)). "If there is a valid question of coverage, i.e., the claim is 'fairly debatable,' the insurer bears no liability for bad faith." Wacker-Ciocco v. Gov't Emp. Ins. Co., 439 N.J. Super. 603, 611 (App. Div. 2015). Put another way, "a plaintiff must show the lack of a reasonable basis for denying the claim or unreasonably delaying its processing, and the insurer's knowledge or reckless disregard that it was acting unreasonably." Id. at 612.

An insurer's denial of coverage may be fairly debatable if the insurer was "not acting in derogation of well settled New Jersey law" and there was a split among other jurisdictions on a legal question pertaining to coverage. Villa Enters. Mgmt. Ltd. v. Fed. Ins. Co., 360 N.J. Super. 166, 189 (Law Div. 2002). On that basis, Mercer's decision to deny coverage was fairly debatable, as there was no binding New Jersey precedent interpreting Mercer's policy form. As we have noted, Mercer's form evidently attempts to narrow the scope of coverage provided under forms like the one we examined in Fantis Foods. We are persuaded by the interpretation of collapse coverage provisions in Hoban,

Malbco, Gurino, Kings Ridge, and DENC, LLC. However, we acknowledge that other courts have accepted interpretations more in line with those Mercer offered. See 5 Michael Raibman and Paul Walker-Bright, New Appleman on Insurance Law Library Edition, § 45.06[2][b][ii]. In sum, Mercer did not act in bad faith.

IV.

Lastly, Parko cross-appeals from the trial court's denial of its motion to amend the consent order for judgment to award it costs, interest, and fees pursuant to the offer-of-judgment rule, Rule 4:58-2. The trial court analogized to a recent Supreme Court case dealing with a high-low settlement agreement, and found that Mercer would not have contemplated these additional fees and costs when it entered into the consent judgment. We disagree.

In April 2015, Parko filed with the court an offer to take judgment against Mercer in the amount of $400,000. Mercer rejected the offer. After extensive pre-trial discovery and motion practice, the court entered its December 4, 2015 order declaring that Parko's loss was covered. At the same time, the court

granted Mercer's motion to compel the parties to utilize the policy's appraisal process for determining the amount of the loss.[6]

The parties filed multiple motions regarding the appraisal process. In particular, the court denied an effort by Mercer to narrow the scope of damages the appraisers were empowered to award. Ultimately, the appraisers appointed by each side agreed that Parko suffered $497,000 in damages, including $79,000 for lost rental income, and $418,000 for damages to the building.

Thereafter, on March 29, 2018, the court entered a "Consent Order for Judgment" reciting that the appraisers had agreed on the amounts of the two elements of damages, and ordered judgment be entered for $497,000 against Mercer and in favor of Parko. The order acknowledged the court's previous coverage decision, and its order compelling the appraisal process to determine the value of Parko's loss. The order noted that "all issues as to all parties have now been adjudicated, with both parties retaining all of their rights and defenses

---

[6] Under the appraisal provision, if the parties disagreed about the amount of the insured's loss, either party could demand the amount be set by appraisal. Under the policy, each side selects a "competent and disinterested appraiser"; and the two appraisers select a "competent and disinterested umpire," to whom the appraisers would turn if they disagreed. Each party pays for its selected appraiser. Other appraisal costs are divided equally. The policy provides that if Mercer agrees to appraisal, it "specifically retains [its] right to deny the claim."

A-4137-17T2

for the appeal going forward." The order noted that "attorneys for all parties . . . affixed their consent" to the order for judgment.

Parko then filed a motion to amend the order for judgment to award slightly under $218,000 in attorneys' fees, costs, and pre-judgment interest pursuant to Rule 4:58-2. The trial court denied the motion, concluding that Mercer did not contemplate such additional fees when it entered into the consent order. The trial court analogized to the Court's recent decision in Serico v. Rothberg, 234 N.J. 168 (2018). There, the Court denied a plaintiff's Rule 4:58 motion after it had entered into a high-low agreement, because the agreement constituted the lowest and highest recovery contemplated by the parties, including any additional fees or interest beyond a damages recovery. Id. at 179-80.

The offer-of-judgment rule is "'designed particularly as a mechanism to encourage, promote, and stimulate early out-of-court settlement of . . . claims that in justice and reason ought to be settled without trial.'" Wiese v. Dedhia, 188 N.J. 587, 593 (2006) (quoting Gonzalez v. Safe & Sound Sec. Corp., 185 N.J. 100, 125 (2005)). "[T]he rule imposes financial consequences on a party who rejects a settlement offer that turns out to be more favorable than the ultimate judgment." Schettino v. Roizman Dev., Inc., 158 N.J. 476, 482 (1999).

The costs also extend to those incurred as a result of appellate proceedings. Serico, 234 N.J. at 177.

The relevant text of the rule states,

> if the offer of a claimant is not accepted and the claimant obtains a money judgment, in an amount that is 120% of the offer or more, excluding allowable prejudgment interest and counsel fees, the claimant shall be allowed, in addition to costs of suit: (1) all reasonable litigation expenses incurred following non-acceptance; (2) prejudgment interest of eight percent on the amount of any money recovery from the date of the offer or the date of completion of discovery, whichever is later . . . ; and (3) a reasonable attorney's fee for such subsequent services as are compelled by the non-acceptance.
>
> [R. 4:58-2(a).]

No doubt, Parko "obtain[ed] a money judgment" that exceeded 120 percent of its offer, excluding prejudgment interest and attorney's fees. The only question is whether Parko waived its right to recover litigation expenses, interest, and attorney's fees by entering into the consent judgment. We conclude it did not.

In Serico, the parties entered a high-low agreement that established $1 million as the plaintiff's maximum recovery, even if a jury returned with a verdict above that amount. Interpreting the agreement, the Court held that the parties expected that $1 million included any fees and costs beyond damages.

A-4137-17T2

Id. at 179-80. By contrast, Parko's and Mercer's consent to the order of judgment does not represent an agreement to pay the amount set forth. The consent judgment in this case was not in the nature of a settlement of the parties' dispute. The appraisal provision of the policy expressly provided that Mercer retained its right to deny the claim, even if it submitted to an appraisal. Furthermore, the consent order for judgment expressly stated that the parties retained all their rights and defenses for "the appeal going forward." Thus, Mercer retained the right to challenge the nature of damages appraised, which was the subject of a prior motion.[7]

Nor is Parko precluded from recovery because the appraisal process is an alternative non-litigation means of resolving a dispute over damages. We acknowledge that the offer-of-judgment rule is not available for the recovery of fees, expenses, and interest incurred in court-annexed arbitration pursuant to Rule 4:21A. See R. 4:21A-3 (stating "[t]he provisions of R. 4:58 shall not apply to arbitration proceedings"). However, our Supreme Court has recognized that an insurance appraisal process is not arbitration. Elberon Bathing Co. v.

---

[7] Presumably, the parties waived any challenges to the appraisal process that they failed to make, such as a claim that an appraiser was not disinterested. See 5 Richard J. Cohen, et al., New Appleman on Insurance Law Library Edition § 47.06[3] (2020) (discussing challenge to selection of appraisers).

Ambassador Ins. Co., 77 N.J. 1, 16-18 (1978).  As a means of an alternative dispute resolution, appraisals are entitled to judicial respect.  Id. at 14.  Yet, appraisals differ in many ways from arbitration.  Id. at 16-18.  In particular, "[a]n agreement for arbitration ordinarily encompasses the disposition of the entire controversy between the parties, and judgment may be entered upon the award, whereas an appraisal establishes only the amount of loss and not liability."  Id. at 17.

Inasmuch as the Court Rule expressly excludes only Rule 4:21A arbitration from the scope of the offer-of-judgment rule, we conclude that there is no impediment to Parko's recovery, notwithstanding the parties' resort to a different form of alternative dispute resolution, mandated by their insurance contract.  Therefore, we remand to the trial court to determine Parko's "reasonable litigation expenses" incurred after Mercer's non-acceptance; its "reasonable attorney's fee[s]" for services "compelled by the non-acceptance"; and prejudgment interest as prescribed by the offer-of-judgment rule.  R. 4:58-2(a).

To the extent not addressed, any other claims raised by either party lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed in part, reversed in part and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4137-17T2